Milton J. CHRISTENSEN, Alisa Jamieson, Erika Henderson, William Noggle, Troy Briggs, and all others similarly situated, Plaintiffs-Appellants,

v.

Michael J. SULLIVAN, Robert Kliesmet and Lev Baldwin, Defendants,

MILWAUKEE COUNTY, David A. Clarke, Jr., Milwaukee County Sheriff, Defendants-Respondents.†

Court of Appeals

*No. 2006AP803. Submitted on briefs November 6, 2007.
—Decided January 29, 2008.*

2008 WI App 18

(Also reported in 746 N.W.2d 553.)

† Petition to review granted 5/13/08.

754

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Patrick O. Patterson* of the *Law Office of Patrick O. Patterson, S.C.*, of Milwaukee, *Peter M. Koneazny* of the *Legal Aid Society of Milwaukee, Inc.* of Milwaukee and *Laurence Dupuis* of the *American Civil Liberties Union of Wisconsin Foundation, Inc.* of Fox Point.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Charles H. Bohl, Nathan A. Fishbach* and *Andrew A. Jones* of *Whyte Hirschboeck Dudek S.C.* of Milwaukee and *John E. Schapekahm* of *Office of the Corporation Counsel Milwaukee County Courthouse* of Milwaukee.

Before Wedemeyer, Fine and Kessler, JJ.

¶ 1. KESSLER, J. When the trial court concluded that sanctions or compensation for continuing contempt were not available because Milwaukee County (County) had ceased violating the Consent Decree on which the trial court based its finding of contempt, it did not have the benefit of our supreme court's holdings in *Frisch v. Henrichs*, 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85, decided in July 2007, while this appeal was pending. We conclude that the remedy of sanctions under Wis. Stat. § 785.04 for continuing contempt, as described in *Frisch*, is applicable to the contempt found by the trial court here. We reverse and remand for determination of the amount of the sanction.

*Background*

¶ 2. In March 1996, Milton Christensen, who was then confined in the Milwaukee County Jail, filed a *pro se,* handwritten petition for a writ of prohibition seeking relief from what he described as dangerous conditions within the jail. Shortly thereafter, the Legal Aid Society of Milwaukee, Inc.[1] began representing Chris-

---

[1] The Legal Aid Society was later joined by the American Civil Liberties Union of Wisconsin Foundation and individual cooperating counsel, all of whom participated in this appeal.

tensen, and in July 1996, filed a class action complaint[2] on behalf of "all persons who are now or in the future will be confined in the Milwaukee County Jail," alleging constitutional violations by the defendants based upon the conditions maintained in the jail. In the proceedings giving rise to this appeal, the trial court summarized the lengthy complaint as alleging "that the conditions at the Milwaukee County Jail were substandard, lead to the infliction of needless pain and suffering, and created a threat to the inmates' mental and physical well-being. These conditions were presumably caused by [] serious overcrowding problems at the Jail."

¶ 3. Ultimately, the parties resolved their differences and in March 2001, entered into a forty-eight page settlement agreement (referred to by the parties and the trial court as a Consent Decree), which was approved by the trial court in May 2001, and became an order of the court.[3] Problems with the jail conditions did not end, and by late 2003, plaintiffs requested, and the trial court authorized over opposition by the County, investigation and discovery on the question of defendants' compliance with the Consent Decree.

¶ 4. In the fall of 2004, plaintiffs moved for enforcement of the Consent Decree, alleging numerous and persistent violations thereof by defendants. Plaintiffs sought a finding of contempt and damages for breach of contract, i.e., the terms of the Consent

---

[2] The individual defendants were sued in their representative capacities. Robert Kliesmet and Lev Baldwin served successively as Sheriff of Milwaukee County. The Secretary of the Wisconsin Department of Corrections (DOC), Michael J. Sullivan, was dismissed from this case after a settlement was reached between the DOC and the plaintiff class.

[3] The Honorable Thomas E. Donegan presided over the initial proceedings and approved the Consent Decree.

Decree. In the trial court's decision and order resolving that motion, the trial court[4] provided an excellent summary of the portions of the Consent Decree relevant to these proceedings, and the factual positions of the parties related thereto, which we adopt and set forth in substantial part herein with emphasis as supplied by the trial court:

The Consent Decree is divided into two parts. One part deals with inmate overcrowding and the other deals with the medical services provided to inmates. The provision of the Consent Decree at issue in the present motion before this Court involves inmates' length of stay in the booking/open waiting area of the jail. The relevant portion of the Consent Decree provides as follows:

C. As of 3/21/01, and thereafter, no jail inmate shall be required to sleep on a mattress on the jail floor or on the jail floor. **There shall be no inmate in the jail for longer than thirty hours** without being assigned to a bed approved by regulations of the Wisconsin Department of Corrections for overnight housing. (See Paragraph D, next following).

D. **Best efforts** shall be made to assure that there will be no more than 110 inmates in booking area at the midnight count. If the number exceeds 110, there shall be a plan for adequate emergency staffing in the booking room. The plan shall limit the number of inmates in the locked rooms surrounding the open waiting area in the booking room and shall specify how often those side rooms are checked. The maximum permanent population limit for the jail shall be 1100 at the midnight, "11:59," count

[4] The Honorable Clare L. Fiorenza presided over the later enforcement proceedings which are the subject of this appeal.

(according to the so-called "Daily Census Reports"). The 1100 permanent capacity limit of the jail assumes that there will be a reasonable number of persons held on a short-term basis in the booking area. **Since there are no beds in the booking room, a number of inmates may be placed there for not more than thirty hours. County defendants will exercise best efforts to limit any inmate's stay in booking-open waiting to twenty-four hours.**

(Consent Decree, Section II, Paragraphs C and D, emphasis added.)

¶ 5. As to the material facts, the trial court reported substantial agreement between the parties, noting: "Plaintiffs maintain that this 'thirty-hour' requirement was violated on 16,662 occasions from November of 2001 through April of 2004. The County does not dispute that there were, in fact, approximately 16,000 such violations." Relying on WIS. STAT. §§ 785.01 and 785.02 (2005–06),[5] and *Shepard v. Circuit Court for Outagamie County*, 189 Wis. 2d 279, 287, 525 N.W.2d 764 (Ct. App. 1994), the trial court found 16,662 violations between November 2001 and May 2004. The trial court made additional findings that:

> [T]he actions of Milwaukee County officials were intentional. The sheer number of violations, 16,662 is staggering. These violations spanned a relatively long period of time, from approximately November of 2001 (only months after the Consent Decree was approved by Judge Donegan) until May of 2004. Although Milwaukee County contends that it was unaware of the extent of the problem, it is beyond this Court's compre-

---

[5] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

hension how over 16,000 violations of the Consent Decree could go undetected.

Milwaukee County officials had the capability to track how long inmates were being held in the booking/open waiting area . . . . Inmates who were held in booking for longer than seventy-two (72) hours were given showers and new clothes . . . . [T]he existence of the shower list also demonstrates . . . that the County actually knew that the Consent Decree was being violated.

Milwaukee County was put on notice of problems in the booking area in December of 2002 and January of 2003 when the County Board Judiciary Committee was forced to respond to complaints from Sheriff's Deputies that overcrowding in the booking area was creating unsafe working conditions . . . .

Among the conditions described by some of the Plaintiffs (and not directly contradicted by the Affidavits submitted by Milwaukee County) include: overly crowded conditions, inmates who were forced to sit or sleep on the floor next to urinals, inmates who had to sit-up for hours and hours, lack of hygiene, unsanitary conditions, inmates who were not given pillows or blankets to sleep on, cells that were infested with bugs, cold temperatures, bodily fluids on the floor and bad odors . . . . [B]etween November of 2001 and April of 2004, 4811 inmates were kept in this environment for longer than two days, and 719 inmates were held there for more than three (3) days. Some of these inmates were held in booking in excess of 100 hours . . . .

It is quite telling that the thirty-hour violations ceased immediately after the Plaintiffs filed this motion to enforce its [sic] rights under the Consent Decree. The speed at which Milwaukee County was able to remedy the problem and improve the conditions in the booking area demonstrates that had the County made a serious effort to comply with the thirty-hour requirement, it could have prevented the violations.

762

¶ 6. On January 4, 2006, although the trial court specifically found that "Milwaukee County's actions were intentional and constitute Contempt of Court" the trial court concluded that "the remedial sanctions that the Plaintiff Class seeks, based upon a plain reading of the applicable statutes, is not available." The trial court concluded that remedial sanctions were only available to terminate a continuing contempt, and since the parties agreed that the violations of the thirty-hour rule ended in May 2004, the trial court concluded that there was no continuing contempt. In addition, the trial court, analyzing the Consent Decree as a contract, found that Milwaukee County had breached the Consent Decree, but that damages based on that breach were not available because: the 2001 complaint (which ultimately resulted in the Consent Decree) did not request money damages; prior to the trial court approving the Consent Decree, plaintiffs' counsel stated repeatedly that the relief sought applied to conditions for the inmates, not to money damages; and the language of the Consent Decree does not "indicate that either party contemplated that monetary damages would be available in the event of a breach." Plaintiffs appealed.

*Standard of review*

¶ 7. Interpretation of Wis. Stat. ch. 785 is a question of law that we review *de novo. Rosario v. Acuity & Oliver Adjustment Co.*, 2007 WI App 194, ¶ 8, 304 Wis. 2d 713, 738 N.W.2d 608. Whether the trial court had the authority to apply remedial contempt sanctions under the facts found requires interpretation and application of a statute, which is a question of law that we review *de novo. Frisch v. Henrichs*, 736 N.W.2d 85,

763

¶ 29; *see also Evans v. Luebke*, 2003 WI App 207, ¶ 16, 267 Wis. 2d 596, 671 N.W.2d 304; *Shepard*, 189 Wis. 2d at 286.

*Contempt*

■

¶ 8.　Milwaukee County does not appeal the finding that it was in contempt of the trial court's order approving the Consent Decree based on more than 16,000 violations over a period of twenty-nine months, and that those violations were intentional. "The legal definition of 'intentional' is essentially the same, whether found in tort law or in criminal law, and we see no reason to use a separate definition when interpreting the same word used in the contempt statute." *Shepard*, 189 Wis. 2d at 286–87. Nor is there a claim that an improper procedure was used in determining whether intentional violation of the order occurred. We are concerned here only with whether financial sanctions may be imposed to purge the contempt found by the trial court in this case.

■

¶ 9.　The power to enforce its orders by exercise of contempt powers is inherent to a court. *Frisch*, 736 N.W.2d 85, ¶ 32. For more than one hundred twenty years, our courts have acceded to legislative statutes which prescribe procedure or penalty limitations. *See Luebke*, 267 Wis. 2d 596, ¶ 17 (relying on *State ex rel. Lanning v. Lonsdale*, 48 Wis. 348, 367, 4 N.W. 390 (1880)). "The legislature may regulate and limit the contempt power 'so long as the contempt power is not rendered ineffectual.'" *Frisch*, 736 N.W.2d 85, ¶ 32 (internal citation omitted).

¶ 10.   Wisconsin statutes permit a court to enforce its orders by imposing either remedial or punitive sanctions. *See* WIS. STAT. § 785.04. Punitive sanctions focus on upholding the authority of the court, must be pursued by the district attorney or other prosecuting authority unless the contempt occurs in the presence of the court, and are conducted under the rules of criminal procedure. *See* WIS. STAT. § 785.03(1)(b); *Frisch*, 736 N.W.2d 85, ¶ 34; *Diane K.J. v. James L.J.*, 196 Wis. 2d 964, 969, 539 N.W.2d 703 (Ct. App. 1995) (Punitive contempt is not concerned with private interests of a litigant.); *State v. Chinavare*, 185 Wis. 2d 528, 529–30, 518 N.W.2d 772 (Ct. App. 1994) ("A complaint issued under [WIS. STAT.] § 785.03(1) . . . 'shall be processed under [WIS. STAT.] chs. 967 to 973.' "). Remedial sanctions, however, focus on the rights of the victim of the disobedience to the court order. Section 785.03(1)(a). Such sanctions may be requested by any victim of contumacious conduct, and the statutes provide remedies for the contempt which are aimed at ending the harm to the victim resulting from noncompliance with the order. *See* § 785.03(1)(b); *Frisch*, 736 N.W.2d 85, ¶ 35; *State v. King*, 82 Wis. 2d 124, 130, 262 N.W.2d 80 (1978); *Diane K.J.*, 196 Wis. 2d at 968. The harm of noncompliance, in some circumstances, may not be remedied merely by a belated compliance with the order sought to be enforced. *See Frisch*, 736 N.W.2d 85, ¶¶ 42, 43 & 47.

¶ 11.   Here, we are concerned only with the remedial sanctions for which the legislature has provided, in WIS. STAT. §§ 785.01(2), (3) and 785.04:

> **785.01 Definitions.** In this chapter: . . . **(2)** "Punitive sanction" means a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court.

**(3)** "Remedial sanction" means a sanction imposed for the purpose of terminating a continuing contempt of court.

785.04 **Sanctions authorized.**

**(1)** REMEDIAL SANCTION. A court may impose one or more of the following remedial sanctions:

(a) Payment of a sum of money sufficient to compensate a party for a loss or injury suffered by the party as the result of a contempt of court.

(b) Imprisonment if the contempt of court is of a type included in s. 785.01 (1) (b), (bm), (c) or (d). The imprisonment may extend only so long as the person is committing the contempt of court or 6 months, whichever is the shorter period.

(c) A forfeiture not to exceed $2,000 for each day the contempt of court continues.

(d) An order designed to ensure compliance with a prior order of the court.

(e) A sanction other than the sanctions specified in pars. (a) to (d) if it expressly finds that those sanctions would be ineffectual to terminate a continuing contempt of court.

¶ 12. Statutory construction " 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.' " *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). The legislature, in WIS. STAT. § 785.04(1)(a), specifically authorizes payment of money to compensate a victim for an "injury suffered by the party as the result of a contempt of court." Use of the past tense in the

statute plainly authorizes payment for injuries that occurred in the past. The legislature apparently recognized that bringing a party into compliance with a court order did not necessarily cure the harm the victim of the noncompliance had already sustained because of the violation of the court order.

¶ 13. Under Wis. Stat. ch. 785, our courts have imposed, or approved, the payment of money to the victim of disobedience to the court order as remedial sanctions for injury sustained, although the disobedience had ended when the financial sanction was, or was to be, determined. In *Griffin v. Reeve*, 141 Wis. 2d 699, 416 N.W.2d 612 (1987), the court held that contempt was an appropriate remedy for a court to utilize to enforce past due child support payments after the child has reached majority. *Id.* at 704. The case arose out of a divorce from a ten-year marriage in which the mother was awarded sole custody of the minor child, and the father was given reasonable visitation rights and ordered to pay $25 in child support on a weekly basis until the child became self-supporting or reached the age of eighteen, whichever occurred first. *Id.* at 701. At the time the child reached the age of eighteen, the father owed $5375. *Id.* Two months after the child reached eighteen, the contempt action was filed, whereupon the father paid to the mother $3500. *Id.* at 701–02. Thereafter, the circuit court dismissed the action on the ground that it lacked jurisdiction because the child was eighteen years old. *Id.* at 702. The supreme court took the case on bypass. *Id.* at 700.

¶ 14. In support of his argument that contempt remedies are not available once a child is no longer a minor, the father argued that "[t]he purpose of a remedial sanction under ch. 785 in child support actions is to insure present and future compliance . . . . Once the

767

child reaches the age of majority, the child no longer needs the remedy of contempt to protect his or her welfare." *Id.* at 707–08. This is so, he argued, because a contempt action for failure to pay child support is a sanction for past contempt, which is a punitive sanction, for which a private party cannot bring an action. *Id.* at 708.

¶ 15.   In concluding that contempt was an appropriate remedy and that a court retained jurisdiction to enforce its support orders even after a child reached the age of majority, the supreme court held that such a contempt proceeding was "not to punish a past contempt but to coerce [the father] into complying with an existing court order." *Id.* If the amount ordered is not paid, even if a child is at the age of majority, the contempt continues, "achiev[ing] the purpose of the remedial sanction, namely to provide a mechanism to effect compliance with the court-ordered duty to support" as its "dominant purpose . . . is to aid the private litigant." *Id.*

¶ 16.   In *Larsen v. Larsen*, 165 Wis. 2d 679, 478 N.W.2d 18 (1992), the supreme court addressed a Wisconsin court's inherent authority to impose purge conditions outside of the mere compliance with the violated order. Larsen, a Vietnam War veteran, repeatedly failed to make child support payments pursuant to a divorce decree. *Id.* at 681. The trial court's attempts to enforce its support order, including numerous contempt proceedings and reductions in the level of support, met with minimal success, and the court found Larsen in contempt under Wis. Stat. § 785.01(1)(b), ordering Larsen to serve ninety days in jail as a remedial sanction. *Id.* at 682. The trial court determined that Larsen's contempt related to his inability to obtain employment, and that this inability to find work was

directly related to his Post Traumatic Stress Disorder (PTSD), for which he refused treatment. *Id.* The court granted Larsen an opportunity to stay the jail sentence and purge his contempt by agreeing to seek treatment for his PTSD and seek employment. *Id.*

¶ 17. On appeal, Larsen contended that because the purge condition was tantamount to an involuntary commitment under WIS. STAT. ch. 51, he was entitled "to receive all the due process safeguards afforded" thereunder. *Id.* at 683. The supreme court concluded that under the facts of *Larsen*, the court had not ordered an involuntary commitment, but rather a jail sentence. Because "the treatment was only a purge condition, exercisable at Larsen's will," and was not ordered as a remedial sanction, which would have required a ch. 51 hearing, Larsen's due process rights were not violated. *Larsen*, 165 Wis. 2d at 684–85. In discussing remedial sanctions and purge conditions under WIS. STAT. § 785.04, the court noted that "it is within the circuit court's inherent authority to grant purge conditions which allow contemnors to purge their contempt outside of complying with the court order which led to the contempt." *Larsen*, 165 Wis. 2d at 685. It then set forth the following rule: "If a circuit court grants a purge condition, the purge condition should serve remedial aims, the contemnor should be able to fulfill the proposed purge, and the condition should be reasonably related to the cause or nature of the contempt." *Id.*

¶ 18. In *Evans v. Luebke*, 2003 WI App 207, 267 Wis. 2d 596, 671 N.W.2d 304, we determined that an attorney who was guardian ad litem for minor children was in contempt when she did not follow a trial court order that she deposit the proceeds of a minor settlement in specific bank accounts for the benefit of the minors. *Id.*, ¶ 22. We rejected the attorney's claim that

the action to recover the funds was really litigation based on negligence (as to which she asserted various defenses), holding that the trial court had the authority under WIS. STAT. ch. 785 to impose remedial sanctions because its order had been, and was being, ignored. *Luebke*, 267 Wis. 2d 596, ¶¶ 9, 14 & 15. The trial court ordered the attorney to: (1) deposit the missing funds in separate accounts as initially ordered; (2) add the interest lost during non-compliance; (3) pay the attorney fees of the subsequent guardian ad litem who brought the action to get the money back; and (4) return the fees earlier approved for her work in obtaining the minor settlement. *Id.*, ¶¶ 7–8. We concluded that "what the circuit court imposed in this case were 'remedial sanctions,' i.e., ones 'imposed for the purpose of terminating a continuing contempt'" based on the definition in WIS. STAT. § 785.01(3). *Luebke*, 267 Wis. 2d 596, ¶ 22. Although we reversed and remanded because the circuit court had not followed the procedures required by ch. 785 as a condition precedent to imposing remedial sanctions, *Luebke*, 267 Wis. 2d 596, ¶¶ 24–25, we concluded that all of the sanctions already imposed, except the return of the guardian ad litem's attorney fees, were authorized by ch. 785, *Luebke*, 267 Wis. 2d 596, ¶¶ 26–29. We did not separately analyze recovery of the lost interest and the attorney fees incurred by the subsequent guardian ad litem (to obtain belated compliance by the attorney with the original court order) as each of those financial sanctions were compensation to the victims for injuries suffered in the past, were necessary to remedy the injury directly caused by the attorney's violation of the court order, and thus all were compensable under WIS. STAT. § 785.04. *Luebke*, 267 Wis. 2d 596, ¶ 27. We noted, by contrast, that return of the attorney fees earned by the guardian ad litem as

counsel for the minors, which sum had been previously specifically approved and authorized by the court's order, did not represent "compensation of the minors for losses stemming from [the attorney's] failure to comply with other provisions of the orders." *Id.*, ¶ 28. Based on § 785.04, we directed that:

> On remand, after notice and a hearing, if the court finds that [the attorney] intentionally disobeyed its orders regarding disposition of the minors' settlement proceeds, it may impose monetary sanctions pursuant to WIS. STAT. § 785.04(1). These may include, under § 785.04(1)(a), requiring [the attorney] to compensate the minors for their losses suffered as a result of her contempt and requiring her to pay the costs of procuring the restoration of the minors' funds. If the court deems additional monetary sanctions necessary or appropriate, such sanctions must be tied to the purposes set forth in paragraphs § 785.04(1)(c)-(e).

*Luebke*, 267 Wis. 2d 596, ¶ 30.

¶ 19. The sanctions we approved in *Luebke*— return of the minors' money (which put the attorney in compliance with the face of the order), payment of interest lost on that money, and payment of attorney fees to a subsequent guardian ad litem who pursued the victims' remedies for contempt—were authorized based on the language of the statute and the intentional and continuing disobedience of the court's order. That continuing disobedience, as in *Frisch*, caused injuries that could not be undone merely by belated compliance with the order. Thus, as in *Frisch*, the injuries compensated in *Luebke* can also be understood as a form of continuing contempt because the noncompliance frustrates the basic purpose of the original order (to safeguard the minors' personal injury recovery) which could be purged only by requiring the contemnor to restore the

victims of the contumacious conduct to the position in which they would have been had the contempt not occurred. Because of the prior holding in *Luebke*, we understand *Frisch* to be further explanation of the scope of Wis. Stat. § 785.04, rather than announcement of new law.[6]

¶ 20. Our supreme court decided *Frisch* on July 17, 2007, well after the trial court ruled and briefing in this appeal was complete. As in *Luebke*, the court in *Frisch* dealt with damages to the victim of contempt that were not, and could not be, undone by belated compliance with the relevant order. Both parties submitted supplemental statements[7] advising this court of

---

[6] *See Kurtz v. City of Waukesha*, 91 Wis. 2d 103, 108, 280 N.W.2d 757 (1979) ("Retrospective application of a judicial holding is a question of policy, not constitutional law."). The explanation in *Frisch v. Henrichs*, 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85, of Wis. Stat. § 785.04, is a judicial holding rather than application of a new statute. *See Mosing v. Hagen*, 33 Wis. 2d 636, 642, 148 N.W.2d 93 (1967) (holding that a statute, adopted by the court through its rulemaking authority, applied retroactively unless it affected a vested or contractual right or imposed an unreasonable burden upon the party attempting to comply with the procedural requirements).

Ordinarily the announcement of a new "judicial holding" is retroactive unless it "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed," and retroactive application will either further or retard the policy announced, and will "produce substantial inequitable results." *Trinity Petroleum, Inc. v. Scott Oil Co.*, 2007 WI 88, ¶ 77, 302 Wis. 2d 299, 735 N.W.2d 1 (footnote and citations omitted).

[7] These supplemental statements were submitted under the authority of Wis. Stat. § 809.19(10). The submissions of both parties have been considered and were helpful to the court.

their views of the impact of *Frisch* on this case. Plaintiffs argued that *Frisch* clarifies both "continuing contempt" and the application of remedial contempt under Wis. Stat. ch. 785 by authorizing compensation to contempt victims, even though the contempt has ceased by the time the compensation is considered, if the harm caused by the original violation is not undone by ending the contumacious action. Because *Frisch* clarifies that if the harm is continuing, the statutes permit the purge condition to be the same as the sanction, plaintiffs argue that those harmed by the contempt should be compensated by a financial sanction which would purge the continuing nature of the harm earlier inflicted.

¶ 21. The County argues that *Frisch* is both legally and factually distinguishable, but not that the principles discussed may not be applied here. The County argues that *Frisch* does not affect the outcome here because: *Frisch* must be limited to the unique context of family law child support obligations; unlike in *Frisch*, there is no continuing contempt in this case as the parties agree the thirty-hour rule violations ceased as of May 2004, before plaintiffs moved for a finding of contempt; and the victims of the contempt here have not "lost their traditional remedy,"[8] and thus no compensation is necessary to purge the contempt.

[8] The "traditional remedy" to which the County refers is apparently a separate civil action, either state or federal, for compensatory damages by each individual who was subjected to the conditions created by the County's violation of the terms of the Consent Decree. Such a "traditional remedy" would encourage a party to ignore obligations of a consent decree if the only practical remedy was numerous individual lawsuits by all victims of the violations. We fail to see how that "traditional remedy" is either fair to the individual inmates who are class members harmed by the County's actions here, or how such

¶ 22. The County had been put on notice of problems in the booking area in December 2002 and January 2003, based on complaints from sheriff's deputies, brought to the County Board Judiciary Committee, about unsafe working conditions in the booking area because of overcrowding. The record also reflects, and the trial court noted, that violations continued after March 23, 2004, when plaintiffs requested discovery on the subject of violations of the Consent Decree. It was not until May 2004,[9] after the requested discovery was underway, but before plaintiffs filed the motion for a finding of contempt and sanctions on September 13, 2004, that the County complied with the terms of the 2001 Consent Decree.

¶ 23. As the trial court noted, the standard for intentional misconduct in the contempt context discussed in *Shepard*, 189 Wis. 2d at 287, was met here. *See also Gower v. Circuit Court for Marinette County*, 154 Wis. 2d 1, 452 N.W.2d 354 (1990). Because of the County's violations, inmates in the booking area were forced to endure a variety of unsafe and unsanitary conditions because of overcrowding which were specifically prohibited by the Consent Decree. The trial court graphically described these violations as including, among other things, forcing inmates to sleep on the floor next to urinals, bug-infested cells, bodily fluids on the floors, and bad odors. *See* ¶ 5, *supra.* As we have seen, when the purpose of the court's order has been thwarted for a substantial period of time by noncompli-

would be an efficient use of judicial resources, particularly when the remedy of contempt has no such obstacles to enforcement of the court's order.

[9] The parties agreed that the violations of the thirty-hour rule ended in May 2004.

ance, and the victim(s) of the noncompliance have suffered unremedied injury as a direct result of that noncompliance, a remedial sanction is not limited to belated technical compliance with the face of the court's order. *Frisch,* 736 N.W.2d 85, ¶¶ 54, 63, 64; *Luebke,* 267 Wis. 2d 596, ¶¶ 27, 30; *Larsen,* 165 Wis. 2d at 685; Griffin, 141 Wis. 2d at 708.

¶ 24. We remand this case to the trial court to determine, in light of this decision and WIS. STAT. § 785.04, the "sum of money sufficient to compensate" the inmates held in violation of the Consent Decree for the "loss or injury suffered," and such further proceedings consistent with this opinion as may be appropriate. Our resolution is based on the available contempt sanctions; therefore, we do not discuss the breach of contract claims as they are unnecessary to resolution of this appeal. *See State v. Blalock,* 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (Cases should be decided on the narrowest possible grounds.).

*By the Court.*—Order reversed and cause remanded with directions.

¶ 25. FINE, J. *(concurring).* I agree with the Majority's result and most of its opinion. In my view, the clear language of the statute, which the Majority quotes in ¶ 11, governs. *Frisch v. Henrichs,* 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85, as the Majority also notes in passing before its discussion in ¶ 19 n.6, of whether it should be applied retroactively, changed nothing. Under WIS. STAT. § 785.04(1)(a)'s forthright and unambiguous directive, the plaintiffs are entitled to be compensated for the losses and injuries they suffered as a result of Milwaukee's clear and blatant contempt.