Milton J. Christensen, Alisa Jamieson,
Erika Henderson, William Noggle and Troy
Briggs and all others similarly situated,
Plaintiffs-Appellants,

v.

Michael J. Sullivan, Robert Kliesmet and
Lev Baldwin, Defendants,

Milwaukee County and David A. Clarke, Jr.,
Milwaukee County Sheriff,
Defendants-Respondents-Petitioners.

Supreme Court

*No. 2006AP803. Oral argument October 8, 2008.
—Decided July 21, 2009.*

2009 WI 87

(Also reported in 768 N.W.2d 798.)

For the defendants-respondents-petitioners there were briefs by *William J. Domina,* Milwaukee County Corporation Counsel, *John E. Schapekahm,* Principal Assistant Corporation Counsel, Milwaukee; and *Charles H. Bohl, Nathan A. Fishbach, Andrew A. Jones,* and *Whyte Hirschboeck Dudek, S.C.,* Milwaukee, and oral argument by *Andrew A. Jones.*

An amicus curiae brief was filed by *Lori M. Lubinsky, Timothy D. Edwards,* and *Axley Brynelson, LLP,* Madison, on behalf of the Wisconsin Counties Association.

For the plaintiffs-appellants there was a brief by *Peter M. Koneazny,* litigation director for the *Legal Aid Society of Milwaukee, Inc.,* Milwaukee; *Patrick O. Patterson, Law Office of Patrick O. Patterson, S.C.,* Fox Point, Cooperating Counsel for Legal Aid Society of Milwaukee, Inc. and ACLU of Wisconsin Foundation, Inc.; and *Laurence Dupuis,* legal director, American Civil Liberties Union of Wisconsin Foundation, Inc., Milwaukee; and oral argument by *Patrick O. Patterson.*

An amicus curiae brief was filed by *Pamela R. McGillivray, Carlos A. Pabellon,* Madison, on behalf of Robert J. Martineau, Gordon G. Myse, David Schwartz, Vincent M. Nathan, and Pamela Susan Karlan.

An amicus curiae brief was filed by *Grant F. Langley,* City Attorney, *Rudolph M. Konrad,* Deputy City Attorney, and *Stuart S. Mukamal,* Assistant City Attorney, Milwaukee, on behalf of The City of Milwaukee.

An amicus curiae brief was filed by *Daniel J. La Fave, Cheri L. Baden,* and *Quarles & Brady LLP,* Milwaukee, on behalf of The Benedict Center, Disability Rights Wisconsin and the Milwaukee Branch of the National Association for the Advancement of Colored People.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals, *Christensen v. Sullivan,* 2008 WI App 18, 307 Wis. 2d 754, 746 N.W.2d 553.

¶ 2. The decision reversed a 2006 order of the Milwaukee County Circuit Court, Clare L. Fiorenza, Judge, denying the plaintiffs' motion for monetary damages as a remedial sanction for the defendants' repeated violations of a Consent Decree involving the Milwaukee County Jail (the Jail). The Consent Decree was approved by the circuit court in 2001. Although the circuit court found that the defendants were in contempt of court, it declined to impose monetary damages as a remedial sanction or for breach of contract. When the court of appeals reversed, it remanded the case to the circuit court instructing it to determine the sum of money sufficient to compensate the inmates at the Jail who were held in violation of the Consent Decree.

¶ 3. The first issue presented in this class action is whether the circuit court was required to order monetary damages for certain members of the class who were inmates at the Jail between 2001 and 2004 as a remedial sanction against the defendants for their repeated violations of the Consent Decree, when there is no dispute that "the violations ha[d] ceased." The second issue is whether the aforementioned inmates are entitled to monetary damages for emotional distress based upon breach of contract, i.e., breach of the Consent Decree.

¶ 4. We conclude, based on the facts of this case, that the circuit court had no discretion to impose a *remedial* sanction against the defendants after their contempt of court had ceased. Remedial sanctions are "imposed for the purpose of terminating a *continuing*

81

contempt of court." Wis. Stat. § 785.01(3) (2007–08)[1] (emphasis added). Punitive sanctions may be "imposed to punish a *past* contempt of court." Wis. Stat. § 785.01(2) (emphasis added). Because breaches of the Consent Decree had ceased before the action for contempt was filed, the circuit court was correct in refusing to impose a *remedial* sanction against the defendants for their past contempt. For multiple reasons, we also conclude that the plaintiff class is not entitled to monetary damages for emotional distress for breaches of the Consent Decree. Consequently, we reverse the decision of the court of appeals.

## I. BACKGROUND AND PROCEDURAL HISTORY

¶ 5. The material facts related to this appeal are not in dispute. On March 12, 1996, Milton J. Christensen (Christensen), an inmate in the Jail, filed a handwritten, pro se writ of prohibition alleging constitutional violations stemming from substandard and dangerous conditions in the Jail. Among the specific conditions complained of were the following: dangerous overcrowding in the Jail; sharing of single-occupancy cells with other inmates; insufficient time outside the cell; and exposure to communicable diseases due to inadequate screening of new inmates. At the time of filing, Christensen had been held at the Jail as a pre-trial detainee for more than a year.

¶ 6. On May 8, 1996, the Milwaukee County Circuit Court, Michael Skwierawski, Judge, appointed the Legal Aid Society of Milwaukee, Inc. (Legal Aid) to represent Christensen. On July 25, 1996, with the assistance of counsel, Christensen amended his com-

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

plaint in an effort to bring a class action "on behalf of all persons who are now or in the future will be confined in the Milwaukee County Jail." The amended complaint alleged constitutional violations at the Jail for substandard conditions.

¶ 7. The amended complaint alleged that the Jail's conditions caused the infliction of needless pain and suffering and created a threat to inmates' mental and physical well-being. The class sought relief "from conditions that fall below contemporary standards of human decency, deny basic human needs, inflict needless pain and suffering, and threaten plaintiffs' physical and mental well-being."

¶ 8. According to the amended complaint, when the Jail opened in 1993, it was designed to hold 798 inmates. This included 54 disciplinary and medical beds designated for temporary or special use. However, the average daily population in the Jail in 1995 was more than 1,200. Paragraph 27 of the amended complaint read as follows:

27. The Jail is seriously overcrowded. Although it is designed to hold a maximum of 798 inmates, the population on July 10, 1996 was 1304 inmates. Of these, 547 were in the Jail post-sentencing, arguably making them the responsibility of the State of Wisconsin. Specifically, there were 260 with parole or probation violations and other charges, 62 with only parole violations, 30 sentenced felons, 88 awaiting sentencing, 31 with division of intensive sanctions penalties, 7 state correctional center inmates, 44 awaiting transfer to the state, and 25 on orders to produce and return. On the other hand, there were 757 there who are the county's responsibility. Specifically, this includes 427 pretrial felony, 236 pretrial misdemeanor, 84 misdemeanor sentenced and 10 municipal commitments. If the population of the Jail were reduced by the number of inmates

who are the State's responsibility, the Jail would not be overcrowded. The annual average daily population in the Jail was over 1200 in 1995; and the monthly average daily population in June, 1996 was 1222.

¶ 9. Paragraph 28 continued with the following:

28. As a result of the high population of inmates, two inmates are confined to cells built for one. The second inmate is routinely forced to sleep on a mattress on the floor because each cell is equipped with only one bed. Because the mattress on the floor is so close to the toilet, the toilet "sweats" and water spills or urine splashes from the toilet onto the floor and gets the mattresses and bedding wet. For most inmates, there are no pillows for persons sleeping on the floor and there is only one blanket even when it is cold in the Jail.

¶ 10. The amended complaint pointed to the special problem of women in the Jail. Women were serving misdemeanor sentences in the Jail, and women also were held in the Jail for violations of probation or parole because there were no alternative facilities, such as the House of Corrections. In addition, inmates lacked sufficient access to adequate mental health care, medical care, and dental care, and women specifically lacked equal access to educational and job-training opportunities.

¶ 11. Defendants included the Secretary of the Wisconsin Department of Corrections, the Milwaukee County Sheriff, and Milwaukee County (collectively referred to as "the County").

¶ 12. On October 15, 1996, the class was certified by the Milwaukee County Circuit Court, Jacqueline D. Schellinger, Judge. It included "all individuals who are now or in the future will be confined in the Milwaukee County Jail . . . and all such confined individuals who

are now or in the future will be subject to the policies and practices of Defendants."

¶ 13. After several years of motions, discovery, and negotiation, the parties submitted a settlement agreement (the Consent Decree) to the court for approval. The circuit court, Thomas E. Donegan, Judge, held hearings and on May 29, 2001, approved the 48–page Consent Decree.

¶ 14. At the hearings on the Consent Decree, the parties made clear that the suit was about injunctive and declaratory relief, not damages. Plaintiffs' counsel stated the following: "[T]he relief applies to all inmates. There are no damages."

¶ 15. The Consent Decree addressed two broad issues: overcrowding and medical services provided to inmates. The overcrowding section set a cap on the total population of the Jail at 1,100, limited the number of inmates in the booking–open waiting area (the BKOW) to 110, and stipulated that no individual would remain in the BKOW longer than 30 hours. The "Medical Services" section included provisions to improve medical and mental health screenings conducted on new inmates, decreased the wait time for sick inmates to receive a physical examination, improved the medication distribution system, developed a mental health program, and increased staffing levels of mental health professionals.

¶ 16. At issue in this case are the provisions addressing the inmates' length of stay in the BKOW. The relevant provisions of the Consent Decree read as follows:

> C. As of 3/21/01, and thereafter, no jail inmate shall be required to sleep on a mattress on the jail floor or on the jail floor. *There shall be no inmate in the jail for*

85

*longer than thirty hours without being assigned to a bed* approved by regulations of the Wisconsin Department of Corrections for overnight housing (see ¶ D, next following).

D. Best efforts shall be made to assure that there will be no more than 110 inmates in booking at the midnight count. If the number exceeds 110, there shall be a plan for adequate emergency staffing in the booking room. The plan shall limit the number of inmates in the locked rooms surrounding the open waiting area in the booking room and shall specify how often those side rooms are checked. The maximum permanent population limit for the jail shall be 1100 at the midnight, "11:59," count (according to the so-called "Daily Census Reports"). The 1100 permanent capacity limit on the jail assumes that there will be a reasonable number of persons held on a short-term basis in the booking area. *Since there are no beds in the booking room, a number of inmates may be placed there for not more than thirty hours. County defendants will exercise best efforts to limit any inmate's stay in booking—open waiting to twenty-four hours.*

(Emphasis added.)

¶ 17. Following court approval of the Consent Decree, the parties skirmished about attorney fees for Legal Aid. On August 27, 2001, Judge Donegan awarded attorney fees against the defendants (except the Wisconsin Department of Corrections). The court entered judgment on attorney fees on January 15, 2002. The defendants appealed but ultimately sought a voluntary dismissal. Defendants satisfied the judgment on January 22, 2003.

¶ 18. The circuit court, Clare Fiorenza, Judge, held a status conference on November 25, 2003. The court then adjourned the matter until May 27, 2004.

¶ 19. On March 23, 2004, plaintiffs moved to conduct discovery. On April 1, 2004, the Principal Assistant Corporation Counsel, John Schapekahm, objected to discovery and filed a lengthy affidavit, which is described *infra* at ¶ 25. On April 6, 2004, the court conducted a motion hearing and then authorized plaintiffs to conduct discovery.

¶ 20. The court held a new status conference on June 2, 2004, and scheduled a tour of the Jail for June 21.

¶ 21. Another status conference was held on July 13, 2004. The docket entry reads in part: "Court met with counsel in chambers, off the record. Matter then called on the record. Matter here for a status conference. Plaintiff to file a contempt motion for violation that occurred prior to 4/28/04. *There have been no new violations since that date.*" (Emphasis added.)

¶ 22. On September 13, 2004, the plaintiff class filed a motion alleging that the County had breached the Consent Decree, specifically the 30–Hour Rule, by holding more than 13,000 inmates in the BKOW for over 30 hours. The plaintiff class requested both contempt-of-court and breach-of-contract remedies.

¶ 23. On November 15, 2004, the circuit court, Jeffrey Kremers, Judge, found that the defendants had violated the Consent Decree and authorized the plaintiff class to conduct discovery to determine whether they were entitled to either contempt or contract remedies, or both.

¶ 24. Discovery uncovered a large number of violations, but the parties disagreed about what caused the violations and whether the defendants' attempts to comply with the Consent Decree were made in good faith. The plaintiff class reported that, between November 2001 and April 2004, the County had violated the

30–Hour Rule on 16,662 occasions. At least 4,811 inmates were held in the BKOW for more than two days, 719 inmates were held for more than three days, and 39 inmates were held for more than 100 hours.

¶ 25. In his affidavit of April 1, 2004, Assistant Corporation Counsel Schapekahm had claimed that the Consent Decree called for substantial compliance by the County defendants as well as semi-annual reports on compliance from the plaintiffs. He claimed that the plaintiffs had failed to file these reports. In response, the plaintiffs submitted a detailed 18–page letter alleging that booking room violations were not disclosed to them and were "in fact denied and otherwise obscured for months in which the plaintiffs were seeking information about this problem." According to the letter, defendants did not provide month-by-month breakdowns of the number of 30–Hour Rule violations until early April 2004. The June 2 letter added the following: "For the past four weeks that defendants have been giving weekly reports of the over-30–hour violations[,] *the number has been zero for each of those four weeks.*" (Emphasis added.)

¶ 26. The County asserted that it made good faith efforts to comply with the Consent Decree. In a letter to the court, dated July 12, 2004, Attorney Schapekahm explained that the violations were the result of breakdowns in communications among administrators and were not intentional. He stated that "I . . . can testify to the shock written across the administrators' faces when the gravity of the situation became apparent."

¶ 27. The defendants blamed general overcrowding in the Jail as a primary cause of the 30–Hour Rule violations. According to Deputy Inspector Jerianne Feiten, who was largely responsible for overseeing the Jail from late 2002 to early 2004: "Orally or in writing,

everyday it was reinforced that we would do—make every feasible attempt possible to reduce facility population. By reducing facility population, that would open up beds upstairs to which those beds would be filled from the booking room . . . ." The defendants emphasized, however, that reducing facility population was largely out of their control because the police and the courts controlled the number of inmates populating the Jail. The Jail population was a function of arrests, sentencings, court dates, and other factors not controlled by the defendants.

¶ 28. The defendants explained that, if the permanent cells in the Jail were full, they had no place to move BKOW inmates. As a result, the BKOW population increased, and with it, the amount of time inmates stayed in the BKOW. Thus, the defendants maintained that, despite their substantial compliance with the Consent Decree as a whole, their "best efforts," and an increase in the County's funding of the Jail from $42.5 million in 2001 to $53.7 million in 2004, they violated the Consent Decree due to circumstances beyond their control.

¶ 29. The defendants also attributed 30–Hour Rule violations to the Jail's "objective housing classification system" used to place inmates in permanent cells. The Jail examined criteria such as age, gender, prior criminal history, pending or sentenced charges, escape history, institutional disciplinary history, alcohol or drug abuse history, and various stability factors to ensure the safety of inmates and staff. While this system served important interests, the defendants said it also slowed the process of placing BKOW inmates in permanent cells. Furthermore, because some inmates could not be placed together—because of gang affiliation, gender, pending charges, or other factors—not

89

every permanent bed in the facility could be utilized and that exacerbated the BKOW population problem.

¶ 30. Despite the various circumstances contributing to the 30–Hour Rule violations, the County quickly remedied the situation after the plaintiffs forced the issue in April 2004. No 30–Hour Rule violations have been documented since May 2004. This fact is notable, defendants claimed, considering that the County voluntarily imposed a stricter population cap on itself than was required by the Consent Decree. Defendants said that approval of funding in April 2004 to open a new dormitory in the House of Corrections was critical to easing population pressures in the Jail.

¶ 31. The plaintiff class took a sharply different view of the County's violations. In a letter to the circuit court on August 25, 2004, the plaintiffs asserted the following:

> The problems were well known in the [J]ail throughout many months in which the plaintiffs were expressly asking for the booking information and during which the defendants provided misleading and false information. The problem did not just "come to light" in April 2004 simply because upper level officials claim to be unaware of the conditions and practices in their jail.

The plaintiffs later pointed to the depositions of several administrators who admitted to knowing about the 30–Hour Rule provisions of the Consent Decree and that it was not being followed.

¶ 32. The plaintiffs cited the existence of a 72–hour shower list as evidence that 30–Hour Rule violations were well-known. BKOW guards maintained a list that kept track of the number of hours each inmate had been held in the BKOW. Any inmate held in the BKOW for 72 hours was to receive a shower. The

existence of such a list, the plaintiffs said, should have raised red flags regarding 30–Hour Rule violations.

¶ 33. The plaintiffs further contended that the County intentionally hid the BKOW population limit violations. Interviews with inmates affected by the 30–Hour Rule violations and analysis of BKOW logs revealed that inmates were often moved out of the BKOW to other temporary locations in the Jail shortly before the nightly "11:59 P.M." count. The purpose of these temporary moves was purportedly to reduce the inmate population in the BKOW artificially in order to comply with the BKOW population cap imposed by the Consent Decree.

¶ 34. In response to these opposing views, Judge Fiorenza made various findings about the County's compliance with the Consent Decree:

> Milwaukee County was put on notice of problems in the booking area in December of 2002 and January of 2003 when the County Board Judiciary Committee was forced to respond to complaints from Sheriffs' Deputies that overcrowding in the booking area was creating unsafe working conditions . . . . Moreover, conditions in the [BKOW] area alleged by members of the Plaintiff class are unacceptable, if not appalling . . . [including] overly crowded conditions, inmates who were forced to sit or sleep on the floor next to urinals, inmates who had to sit-up for hours and hours, lack of hygiene, unsanitary conditions, inmates who were not given pillows or blankets to sleep on, cells that were infested with bugs, cold temperatures, bodily fluids on the floor and bad odors.

¶ 35. The circuit court found that the "staggering" number of violations and extended period of time during which the violations occurred were clear evidence that the violations were "intentional." The

County did not dispute these findings. Also undisputed was the court's finding that "the thirty-hour violations ceased immediately after the Plaintiffs filed this motion" to enforce their rights under the Consent Decree.

¶ 36. In January 2006, the circuit court declared that the County's intentional violations of the Consent Decree constituted contempt of court. However, the circuit court declined the plaintiffs' request to award money damages as remedial sanctions to "members of the plaintiff class who were subjected to violations of the [C]onsent [D]ecree." The court said that, because remedial sanctions are "imposed for the purpose of terminating a continuing contempt of court," Wis. Stat. § 785.01(3), and because it was undisputed that the County's violations had ceased, remedial sanctions could not be imposed.

¶ 37. The court rejected the argument that it could circumvent the legislature's regulation of the contempt power and exercise its inherent contempt power to force a party to comply with a court order. The court stated, "Because the statutory language is clear, the Court will not exercise its inherent powers to impose sanctions."

¶ 38. The court then considered whether breach of contract remedies were available to the plaintiff class. The circuit court found that the County's actions constituted a breach of the Consent Decree. However, although both sides agreed that "contract law applies in interpreting the terms of the Consent Decree," the court held that monetary damages for the breach were not warranted because the Consent Decree did not mention money damages as a remedy for a violation. Furthermore, the plaintiff class did not initiate its suit seeking monetary damages, and the class was certified for declaratory and injunctive relief only.

¶ 39. The plaintiffs appealed, and the court of appeals reversed on the issue of remedial sanctions. The court did not address the breach of contract issue. In analyzing the circuit court's reliance on the contempt statute, the court of appeals stated that:

[section] 785.04(1)(a), specifically authorizes payment of money to compensate a victim for an "injury suffered by the party as the result of a contempt of court." Use of the past tense in the statute plainly authorizes payment for injuries that occurred in the past. The legislature apparently recognized that bringing a party into compliance with a court order did not necessarily cure the harm the victim of the noncompliance had already sustained because of the violation of the court order.

*Christensen,* 307 Wis. 2d 754, ¶ 12. The court of appeals also relied on this court's decision in *Frisch v. Henrichs,* 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85,[2] to determine that the defendants' contempt was "continuing" for purposes of Wis. Stat. ch. 785, and therefore, remedial sanctions could be awarded:

[W]hen the purpose of the court's order has been thwarted for a substantial period of time by noncompliance, and the victim(s) of the noncompliance have suffered unremedied injury as a direct result of that noncompliance, a remedial sanction is not limited to belated technical compliance with the face of the court's order.

*Christensen,* 307 Wis. 2d 754, ¶ 23.

¶ 40. The court of appeals remanded the case to the circuit court instructing it to determine a "sum of

---

[2] *Frisch v. Henrichs,* 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85, was decided after the circuit court's decision rejecting remedial sanctions.

money sufficient to compensate the inmates held in violation of the Consent Decree for the loss or injury suffered." *Id.,* ¶ 24 (internal quotations omitted). Because it found remedial sanctions to be an appropriate remedy, the court of appeals did not reach the question of whether money damages for breach of the Consent Decree could be awarded. *Id.*

¶ 41. The County petitioned this court for review, which we granted on May 13, 2008.

## II. Standard of Review

■

¶ 42. The issues presented in this appeal are reviewed de novo. First, to determine whether the circuit court had the statutory authority under Wis. Stat. ch. 785 to impose remedial sanctions against the County for its contemptuous conduct, even though the contemptuous conduct had ceased at the time the plaintiff class initiated the contempt proceedings, requires this court to interpret and apply statutes.[3] The

---

[3] The plaintiff class requests that we also consider the circuit court's inherent authority to impose remedial sanctions. Also, the dissent advocates, as an alternative to its proposed statutory interpretation, that the circuit court can "protect enforcement of its orders" by utilizing its inherent powers. Dissent, ¶¶ 134–136. We decline, however, to delve into the court's inherent contempt authority because the legislature has enacted reasonable regulations and limitations upon courts' use of the contempt power. *See Frisch,* 304 Wis. 2d 1, ¶¶ 32–33, ("The legislature has regulated contempt in Wis. Stat. ch. 785."); *Douglas County v. Edwards,* 137 Wis. 2d 65, 88, 403 N.W.2d 438 (1987) ("Despite the fact that the power exi[s]ts independently of statute . . . when the procedures and penalties for contempt are prescribed by statute, the statute controls."); *Evans v. Luebke,* 2003 WI App 207, ¶ 17, 267 Wis. 2d 596, 671 N.W.2d

interpretation and application of statutes are questions of law that we review de novo. *Frisch,* 304 Wis. 2d 1, ¶ 29.

¶ 43. Second, determining whether the County's admitted violations of the Consent Decree entitle the plaintiff class to monetary damages requires the court

304 ("[T]he court has proscribed the exercise of [the contempt] power outside of the statutory scheme."); *State v. Aaron D.,* 214 Wis. 2d 56, 69, 571 N.W.2d 399 (Ct. App. 1997) ("[T]he contempt procedures contained in ch. 785, STATS., are reasonable regulations . . . ."); *State ex rel. N.A. v. G.S.,* 156 Wis. 2d 338, 341, 456 N.W.2d 867 (Ct. App. 1990) ("The remedies authorized by statute are the exclusive remedies available . . . .").

Wisconsin courts have consistently declared that the legislature's regulation of the contempt power controls as long as such regulation does not render the court's power impotent or meaningless. *State ex rel. Attorney Gen. v. Circuit Court for Eau Claire County,* 97 Wis. 1, 8, 72 N.W. 193 (1897) ("Doubtless, [the contempt] power may be regulated, and the manner of its exercise prescribed, by statute, but certainly it cannot be entirely taken away, nor can its efficiency be so impaired or abridged as to leave the court without power to compel the due respect and obedience which is essential to preserve its character as a judicial tribunal."); *State ex rel. Lanning v. Lonsdale,* 48 Wis. 348, 367, 4 N.W. 390 (1880) ("[W]henever a statute prescribes the procedure in a prosecution for contempt, or limits the penalty, the statute controls."); *see also* Note, § 11, ch. 257, Laws of 1979, at 1355 ("The supreme court has often acknowledged . . . the power of the legislature to regulate and limit how [the contempt] power is exercised by the courts, so long as the contempt power is not rendered ineffectual."). We do not consider the legislature's regulation of the contempt power to have rendered the circuit court's power impotent or meaningless in this case, especially given the circuit court's ability to appoint a special prosecutor to pursue punitive sanctions. *See* Wis. Stat. § 785.03(1)(b).

to interpret the Consent Decree as it relates to damages for breach. The interpretation of a written agreement between two parties is a question of law that we review de novo. *Columbia Propane, L.P. v. Wis. Gas Co.*, 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 776; *Klein v. Bd. of Regents*, 2003 WI App 118, ¶ 8, 265 Wis. 2d 543, 666 N.W.2d 67.

## III. Discussion

¶ 44. The defendants assert that the circuit court was correct in determining that it did not have authority to impose a remedial sanction against the County for contempt of court. The circuit court reasoned that it could not impose a remedial sanction because the contempt of court—namely, the County's violations of the 30–Hour Rule component of the Consent Decree— had ended before the plaintiff class filed its motion for contempt, and only a *continuing* contempt warrants imposition of a remedial sanction. The circuit court concluded that a *continuing* contempt of court is a prerequisite to the imposition of a remedial sanction under Wis. Stat. ch. 785.

¶ 45. The plaintiff class responds that the circuit court does have statutory authority to impose the remedial sanction "of a sum of money sufficient to compensate a party for a loss or injury suffered," even when contemptuous behavior has ceased and is no longer continuing. *See* Wis. Stat. § 785.04(1)(a). Specifically, the plaintiff class postulates the following:

> Chapter 785, when read as a whole and in light of its legislative intent, history and purpose, gives the trial court discretion to impose remedial sanctions for any contempt of court that has caused a party to suffer loss or injury, and to regard the contempt as "continuing" so long as the loss or injury goes unremedied.

¶ 46. The plaintiff class does not assert that remedial sanctions *must* be imposed when a loss or injury goes unremedied; it argues only that the circuit court has discretion to impose them in such circumstances. Thus, according to the plaintiff class, the circuit court erred in failing to exercise its discretion because it did not recognize its statutory authority to impose a remedial sanction after a contempt of court has terminated. We disagree.

¶ 47. Determining whether the circuit court has discretion to impose a remedial sanction against the County for its past contempt requires us to interpret the statutes found in Wisconsin Statute Chapter 785. "[S]tatutory interpretation begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry. Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (internal quotations and citations omitted). Moreover, "[i]n construing or interpreting a statute the court is not at liberty to disregard the plain, clear words of the statute." *Id.*, ¶ 46 (internal quotations and citation omitted).

A. Wisconsin Contempt Law

¶ 48. We begin our analysis by focusing on the provisions of Wis. Stat. ch. 785, which codifies the law on "Contempt of Court." Wisconsin Stat. § 785.01(1) defines "contempt of court" as *intentional:*

> (a) Misconduct in the presence of the court which interferes with a court proceeding or with the adminis-

97

tration of justice, or which impairs the respect due the court;

(b) Disobedience, resistance or obstruction of the authority, process or order of a court;

(bm) Violation of any provision of s. 767.117(1);

(c) Refusal as a witness to appear, be sworn or answer a question; or

(d) Refusal to produce a record, document or other object.

¶ 49. Wisconsin Stat. § 785.02 provides that a court of record "may impose a remedial or punitive sanction for contempt of court under this chapter." The terms "remedial sanction" and "punitive sanction" are defined in Wis. Stat. § 785.01 as follows:

(2) "Punitive sanction" means a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court.

(3) "Remedial sanction" means a sanction imposed for the purpose of terminating a continuing contempt of court.

¶ 50. As noted, in Wisconsin, contempt sanctions are classified as either punitive or remedial.[4] *See* Wis. Stat. § 785.04. "The remedies authorized by statute are the exclusive remedies available . . . ." *State ex rel. N.A.*

---

[4] Prior to 1979, Wisconsin contempt law distinguished between two types of contempt—criminal and civil—rather than between two types of sanctions that may be imposed for any contempt of court. *See Frisch,* 304 Wis. 2d 1, ¶ 33 n.15; Note, § 11, ch. 257, Laws of 1979, at 1353–54. Rather than be concerned over the type of contempt at issue, the "statute now

*v. G.S.,* 156 Wis. 2d 338, 341, 456 N.W.2d 867 (Ct. App. 1990). The "imposition of either a punitive or a remedial sanction does not preclude imposition of the other type of sanction." Robert J. Martineau, *Contempt of Court: Eliminating the Confusion Between Civil and Criminal Contempt,* 50 U. Cin. L. Rev. 677, 704 (1981) (interpreting Wis. Stat. § 785.04(3) and acknowledging that a punitive sanction may be imposed for past conduct which was a contempt of court even though similar

draws a distinction based on the purpose of the sanction sought to be imposed." *Frisch,* 304 Wis. 2d 1, ¶ 33 n.15.

"Traditionally, a remedial sanction was the type of sanction imposed for civil contempt. The purpose of the sanction was remedial in that it was designed to force a person into complying with an order of the court and terminating a present contempt of court." Note, § 11, ch. 257, Laws of 1979, at 1355. Today, "[t]hat concept is continued here, even though without the civil contempt designation." *Id.* On the other hand, "[u]nder prior law, criminal contempt involved sanctions imposed on past conduct designed to vindicate the authority of the court. Again here, the concept is retained in the definition of punitive sanction . . . ." *Id.*

Therefore, because "[t]he distinction between the purposes of the contempt is retained in the current statute without the criminal and civil contempt designations," *D.L.D. v. Circuit Court for Crawford County,* 110 Wis. 2d 168, 179, 327 N.W.2d 682 (1983), case law interpreting pre-1979 contempt statutes may be used as persuasive authority when interpreting the present contempt statutes, *see, e.g., Frisch,* 304 Wis. 2d 1, ¶ 35 (citing *State v. King,* 82 Wis. 2d 124, 262 N.W.2d 80 (1978), with approval), *State ex rel. Larsen v. Larsen,* 165 Wis. 2d 679, 685, 478 N.W.2d 18 (1992) (same), *D.L.D.,* 110 Wis. 2d at 180 (same). However, because the 1979 legislation was a complete overhaul of the contempt statutes, case law interpreting pre-1979 contempt statutes is not mandatory authority and should not be viewed as decisive when interpreting the current contempt statutes. *See Griffin v. Reeve,* 141 Wis. 2d 699, 706, 416 N.W.2d 612 (1987) ("[Chapter] 785 . . . substantially restates the law of contempt.").

present conduct is a continuing contempt of court). However, "punitive sanctions may not be imposed in remedial sanction proceedings." *N.A.,* 156 Wis. 2d at 341.

¶ 51. Punitive sanctions are "imposed to *punish a past contempt of court* for the purpose of upholding the authority of the court." Wis. Stat. § 785.01(2) (emphasis added). As the definition implies, punitive sanctions are to be imposed for "*past* contempt of court" only. *Id.* (emphasis added); Wis. Stat. § 785.04(3) ("A punitive sanction may be imposed for past conduct . . . ."); *Frisch,* 304 Wis. 2d 1, ¶ 34 (quoting Wis. Stat. § 785.01(2)); *Evans v. Luebke,* 2003 WI App 207, ¶ 21, 267 Wis. 2d 596, 671 N.W.2d 304 (same); *B.L.P. v. Circuit Court for Racine County,* 118 Wis. 2d 33, 42, 345 N.W.2d 510 (Ct. App. 1984) ("The 'punitive sanction' . . . is imposed to punish a past contempt of court . . . ."); Martineau, *supra,* at 694 ("The punitive sanction is concerned with past conduct . . . . [The punitive sanction is] concerned exclusively with past conduct . . . ."); *see also State v. King,* 82 Wis. 2d 124, 131–32, 262 N.W.2d 80 (1978) (determining that the circuit court did not have authority to impose punitive sanctions in a *civil* contempt proceeding because the underlying dispute was settled, and thus, the contempt was no longer continuing, which was a requirement for *civil* contempt under the previous statute).

¶ 52. Therefore, a court imposing a punitive sanction is not specifically concerned with protecting private rights. *Frisch,* 304 Wis. 2d 1, ¶ 34; Martineau, *supra,* at 694 ("[B]ecause the sanction is directed only at past conduct, its imposition cannot directly aid a litigant harmed by the contempt."); *see also Griffin v. Reeve,* 141 Wis. 2d 699, 706–07, 416 N.W.2d 612 (1987)

(stating that the sanctions in that case must be remedial because the case was brought on behalf of a private litigant); Marna M. Tess-Mattner, Comment, *Contempt of Court: Wisconsin's Erasure of the Blurred Distinction Between Civil and Criminal Contempt*, 66 Marq. L. Rev. 369, 377 (1983) (noting that, under the previous contempt statutes, criminal contempt was "not intended to benefit anyone," its "sole purpose" was to vindicate the court's authority).

¶ 53. The imposition of punitive sanctions for past contempt serves at least two important objectives: it upholds the court's authority and it punishes the contemnor. *See* Wis. Stat. § 785.01(2); *Frisch,* 304 Wis. 2d 1, ¶ 34; *Griffin,* 141 Wis. 2d at 708; *Evans,* 267 Wis. 2d 596, ¶ 21; *Diane K.J. v. James L.J.,* 196 Wis. 2d 964, 969, 539 N.W.2d 703 (Ct. App. 1995); *B.L.P.,* 118 Wis. 2d at 42; *Martineau, supra,* at 694. In fact, imposing punitive sanctions is much akin to imposing a criminal penalty, which is why the legislature has required that proceedings for punitive sanctions be brought exclusively by "[t]he district attorney of a county, the attorney general or a special prosecutor appointed by the court" in a nonsummary procedure. Wis. Stat. § 785.03(1)(b); *see also D.L.D. v. Circuit Court for Crawford County,* 110 Wis. 2d 168, 179, 327 N.W.2d 682 (1983) ("Traditionally, a punitive sanction was imposed for criminal contempt . . . ."); Martineau, *supra,* at 693 (demonstrating the commonality between the current statute's definition of "punitive sanction" and the previous statute's definition of "criminal contempt").

¶ 54. Conversely, remedial sanctions are "imposed for the purpose of *terminating a continuing contempt of court.*" Wis. Stat. § 785.01(3) (emphasis added). Logically, this means that remedial sanctions may be imposed *only* when action or inaction constituting con-

101

tempt of court is ongoing and needs to be terminated. *Id.*; Note, § 11, ch. 257, Laws of 1979, at 1355 ("[A] remedial sanction is appropriate *only* when the contempt is continuing . . . .") (emphasis added); *see also Frisch,* 304 Wis. 2d 1, ¶¶ 4, 31 (imposing remedial sanction for continuing contempt for failing to timely comply with a filing required by court order, thereby depriving the opposing party of her traditional remedy under the law); *Griffin,* 141 Wis. 2d at 707–08 (continuing contempt and imposition of remedial sanctions for the father's failure to pay past-due child support even after the child reaches the age of majority); *Evans,* 267 Wis. 2d 596, ¶¶ 22, 27 (continuing contempt with remedial sanctions imposed for the guardian ad litem's ongoing failure to deposit funds as ordered). Without a *continuing* contempt of court, nothing remains to be terminated, and thus, a remedial sanction is unwarranted. *See* Wis. Stat. § 785.01(3); Note, § 11, ch. 257, Laws of 1979, at 1355 ("*[A] remedial sanction . . . cannot be imposed if for any reason the contempt has ceased,* even as the result of the settlement of the case."); *see also King,* 82 Wis. 2d at 131–32, 138 (disallowing civil contempt proceedings under the previous contempt statutes after the underlying dispute settles); 17 Am. Jur. 2d *Contempt* § 145 (2004) ("When the parties settle the underlying case that gave rise to a civil contempt sanction, the contempt proceeding is moot, since the case has come to an end.").

¶ 55. A continuing contempt is required for the imposition of a remedial sanction because remedial sanctions are not designed to punish the contemnor, vindicate the court's authority, or benefit the public. *See Frisch,* 304 Wis. 2d 1, ¶ 35. Rather, the stated and principal objective of a remedial sanction is to force the contemnor into compliance with a court order for the

benefit of a private party—the litigant. *Id.* ("Remedial contempt is concerned with the private interests of the litigant and is 'designed to force one party to accede to another's demand.'" (quoting *King,* 82 Wis. 2d at 130 (interpreting civil contempt under the previous contempt statutes))); *Griffin,* 141 Wis. 2d at 707 ("The purpose of a remedial sanction . . . is to insure present and future compliance . . . ."); *D.L.D.,* 110 Wis. 2d at 179 ("A remedial sanction means a sanction imposed for the purpose of terminating a continuing contempt of court.") (internal quotations omitted); *Evans,* 267 Wis. 2d 596, ¶ 22 ("[T]he circuit court imposed . . . remedial sanctions, i.e., ones imposed for the purpose of terminating a continuing contempt of court.") (internal quotations omitted); *Benn v. Benn,* 230 Wis. 2d 301, 309, 602 N.W.2d 65 (Ct. App. 1999) ("Remedial contempt seeks to procure present and future compliance with court orders . . . ."); *Diane K.J.,* 196 Wis. 2d at 968 ("Remedial contempt is imposed to ensure compliance with court orders."); *B.L.P.* 118 Wis. 2d at 42 ("'[R]emedial sanctions' . . . [are] imposed for the purpose of terminating a continuing contempt of court.").[5] The private nature of a remedial sanction is evidenced by

---

[5] *See* 7 Jay E. Grenig, *Wisconsin Pleading and Practice* 623 (4th ed. 2007) ("[R]emedial sanctions [are] imposed for the purpose of terminating a continuing contempt of court."); Robert J. Martineau, *Contempt of Court: Eliminating the Confusion Between Civil and Criminal Contempt,* 50 U. Cin. L. Rev. 677, 693–94 (1981) ("A remedial sanction . . . is a sanction imposed for the purpose of terminating a continuing contempt of court. . . . [It] is concerned only with future conduct, it lacks a punitive element; rather, it is designed to coerce compliance with the directives of the court.") (internal quotations and footnote omitted); *see also* Grenig, *supra,* at 535 (noting that the previous statute's civil contempt power was imposed "for the benefit of another party"); Marna M. Tess-Mattner, Comment,

the fact that only a party "aggrieved by a contempt of court may seek imposition of a remedial sanction . . . in the proceeding to which the contempt is related," Wis. Stat. § 785.03(1)(a), "for the purpose of terminating a continuing contempt of court," Wis. Stat. § 785.01(3).[6]

¶ 56. The court may impose the following remedial sanctions for the purpose of terminating a continuing contempt of court:

(a) Payment of a sum of money sufficient to compensate a party for a loss or injury suffered by the party as the result of a contempt of court.

(b) Imprisonment if the contempt of court is of a type included in s. 785.01(1)(b), (bm), (c) or (d). The imprisonment may extend only so long as the person is committing the contempt of court or 6 months, whichever is the shorter period.

(c) A forfeiture not to exceed $2,000 for each day the contempt of court continues.

(d) An order designed to ensure compliance with a prior order of the court.

(e) A sanction other than the sanctions specified in pars. (a) to (d) if it expressly finds that those sanctions would be ineffectual to terminate a continuing contempt of court.

Wis. Stat. § 785.04(1).

---

*Contempt of Court: Wisconsin's Erasure of the Blurred Distinction Between Civil and Criminal Contempt,* 66 Marq. L. Rev. 369, 377 (1983) (recognizing that civil contempt under the previous statute was primarily concerned with coercing the contemnor into compliance with a court's order for the benefit of a private party).

[6] *See also Larsen,* 165 Wis. 2d at 683–84 (noting that remedial sanctions under Wis. Stat. § 785.04(1) are "designed to enforce a private right of a party in an action").

¶ 57. The sanctions listed under Wis. Stat. § 785.04(1) "are essentially the same as under prior law." Note, § 11, ch. 257, Laws of 1979, at 1357.[7] Moreover, all but one of the remedial sanctions described in Wis. Stat. § 785.04(1) *expressly* reflect the prerequisite of a continuing contempt of court. *See* Wis. Stat. § 785.04(1)(b) ("The *imprisonment may extend only so long as the person is committing the contempt of court* or 6 months, whichever is the shorter period.") (emphasis added), (1)(c) ("A *forfeiture* not to exceed $2,000 *for each day the contempt of court continues.*") (emphasis added), (1)(d) ("*An order designed to ensure compliance with a prior order* of the court.") (emphasis added), (1)(e) ("A *sanction other than the sanctions specified* in pars. (a) to (d) *if it expressly finds that those sanctions would be ineffectual to terminate a continuing contempt of court.*") (emphasis added).

¶ 58. Section 785.04(1)(a), if read in isolation, could be somewhat ambiguous on this score.[8] Standing alone, the paragraph could be interpreted as allowing payment of a sum of money for a loss or injury suffered in the past; however, such an interpretation would ignore the fact that the continuing nature of the con-

[7] *Compare* Wis. Stat. § 785.04(1)(a)-(e) *with* Wis. Stat. § 295.02(1)-(3) (1975–76) (allowing, subject to maximum limitations, the following sanctions: payment of money "sufficient to compensate the party for losses, costs and expenses"; indefinite imprisonment until compliance is realized; and forfeiture of money for each day the contempt of court continues).

[8] "[S]tatutory language is interpreted in the context in which it is used; *not in isolation* but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110 (emphasis added).

tempt is what authorizes the court to impose a remedial sanction as opposed to a punitive sanction.[9] *See* Wis. Stat. § 785.01(3) (" 'Remedial sanction' means a sanction imposed for the purpose of terminating a continuing contempt of court."); Note, § 11, ch. 257, Laws of 1979, at 1355 ("*[A] remedial sanction . . . cannot be imposed if for any reason the contempt has ceased,* even as the result of the settlement of a case.") (emphasis added); *see also King,* 82 Wis. 2d at 131–32, 138 (disal-

[9] In 1981, Robert J. Martineau, analyzing Wisconsin's recently created law of contempt under Wisconsin Statutes Chapter 785, made the following observation:

Arguably, imposition of absolute rather than conditional money damages as a remedial sanction violates the distinction between remedial and punitive sanctions made in subsections 785.01(2) and (3) because *the sanction is based upon past conduct and is not designed to terminate a continuing contempt.*

Martineau, *supra,* at 701–02. Professor Martineau argues, however, that such an interpretation would be mistaken because imposition of absolute "money damages for contempt" can serve as a remedial sanction. *Id.* at 702. Professor Martineau does not cite the Wisconsin contempt statutes to support this contention. In fact, he offers his own modification to the definition of "remedial sanction" under Wis. Stat. § 785.01(3) to account for his interpretation:

Of course, any apparent inconsistency could be eliminated by modifying Wis. Stat. Ann. § 785.01(3) . . . to read as follows:

(3) "Remedial sanction" means a sanction imposed for the purpose of terminating a continuing contempt of court or of compensating a party for loss or injury suffered as the result of a contempt of court.

*Id.* at 702 n.147. Quite obviously, Professor Martineau's proposed language for Wis. Stat. § 785.01(3) is significantly different from the actual language in Wis. Stat. § 785.01(3). As a result, Professor Martineau's discussion lends further credence to the conclusion that remedial sanctions can be imposed only when the contempt continues.

lowing civil contempt proceedings under the previous contempt statutes after the underlying dispute settles); 17 Am. Jur. 2d *Contempt* § 145 ("When the parties settle the underlying case that gave rise to a civil contempt sanction, the contempt proceeding is moot, since the case has come to an end."). Permitting the imposition of a remedial sanction in a situation where there is no continuing contempt would effectively rewrite the statute.[10] Therefore, the key to the issue in this case is whether the County's contempt of court was continuing on and after the September 13, 2004 motion for a finding of contempt and imposition of remedial sanctions.

¶ 59. Chapter 785 does not define "a continuing contempt of court." If the court is required to interpret a statute and the words in the statute are not defined, the court must apply the ordinary meaning of the words to give effect to the statutory language. *Kalal,* 271 Wis. 2d 633, ¶ 45.

---

[10] Wisconsin Stat. § 785.01(2) defines "punitive sanction" as a "sanction imposed to punish a past contempt of court *for the purpose of upholding the authority of the court.*" (Emphasis added.) Admittedly, there is no difficulty in conceiving of a sanction imposed to punish a past contempt of court for the purpose of aiding a litigant. One interpretation of Wis. Stat. § 785.04(1)(a) is that payment of "a sum of money sufficient to compensate a party for a [past] loss or injury" is that kind of sanction. Wis. Stat. § 785.04(1)(a). The problem with this analysis is that trying to remedy a litigant's past loss or injury by means of a remedial sanction deprives the party in contempt of the protections afforded in punitive sanction procedure and deprives the party of the ability to purge the contempt by complying with a court order. The statutory scheme establishes two kinds of sanctions, each with specific criteria. There may be a void in this statutory scheme, but this void cannot be filled by judicial interpretation without doing violence to the statutes.

¶ 60. The word "continuing" has many definitions. However, when using "continuing" in the context of determining whether something has either been terminated or is ongoing, as in this statute, *see* Wis. Stat. § 785.01(3), the word generally means "[t]o go on with a particular action or in a particular condition; persist," *The American Heritage Dictionary of the English Language* 408 (3d ed. 1992), *see also Black's Law Dictionary* 316 (7th ed. 1999) ("(Of an act or event) that is uninterrupted <a continuing offense>.").

¶ 61. This definition of "continuing" is consistent with our prior case law interpreting whether a contempt of court is "continuing" so that a remedial sanction may be imposed.

¶ 62. For instance, one obvious example of a continuing contempt justifying a remedial sanction is where a parent is delinquent in paying child support. *See Larsen,* 165 Wis. 2d at 682, 685 (upholding remedial sanctions and purge conditions imposed for the father's complete failure to pay child support as ordered); *Griffin,* 141 Wis. 2d at 700–01, 707–08 (holding remedial sanctions to be appropriate, even after the child reaches the age of majority, where the father has refused to pay court-ordered support); *Benn,* 230 Wis. 2d at 306–07, 315 (upholding remedial sanctions and purge condition for the father's repeated failure to pay child support as ordered).

¶ 63. In *Griffin,* the mother initiated contempt proceedings against the father, after the child reached the age of majority, for his failure to make child support payments as required by the divorce decree. *Griffin,* 141 Wis. 2d at 701.[11] The father disputed the court's

---

[11] In this case, the Wisconsin Supreme Court overruled previous case law that disallowed the enforcement of child

authority to impose a remedial sanction in that case, arguing that his contempt could no longer be continuing. *Id.* at 707. His theory was that once a child reaches the age of majority, "the parent's duty to support ceases, and a delinquent parent's contempt ends." *Id.* The father contended that any sanction the court imposed against him for his delinquent child support payments would be a punitive sanction because his contempt had been terminated by the child's 18th birthday and was no longer continuing. *Id.* at 708.

¶ 64. In response, this court concluded that the father's contempt was continuing because, while the court could not modify or terminate the support order after the child reached majority age, "the force of the order does not expire until the parent complies." *Id.* In other words, "A parent's failure to pay child support after the child reaches majority is a continuing disobedience of a court order. *The contempt is not past; it is ongoing.*" *Id.* (emphasis added). Therefore, the court determined that the circuit court did have authority to impose remedial sanctions against the father for his continuing contempt of court. *Id.* at 708–09.

¶ 65. A second example of a continuing contempt of court is found in *Evans.* There, the original guardian ad litem, appointed by the court to obtain approval of settlement agreements for four minors in two personal injury lawsuits, failed to deposit the settlement awards in restrictive trust accounts as ordered by the circuit court. *Evans,* 267 Wis. 2d 596, ¶¶ 1 n.1, 4–5. After learning of the original guardian ad litem's delinquency, the circuit court replaced her with a new guardian ad litem who then moved the circuit court to order the

support orders after the child reached the age of majority. *Griffin,* 141 Wis. 2d at 704 (overruling, in part, *Halmu v. Halmu,* 247 Wis. 124, 19 N.W.2d 317 (1945)).

original guardian ad litem to repay the missing funds. *Id.*, ¶¶ 5–6. Because the original guardian ad litem failed to repay the funds as ordered, the circuit court entered judgment against her for the full amount of the funds using its power under Wis. Stat. § 805.03.[12] *See id.*, ¶¶ 8, 10.

¶ 66. In affirming the circuit court, the court of appeals modified the circuit court's rationale by employing the contempt statutes rather than Wis. Stat. § 805.03. *Id.*, ¶ 20 ("[W]e conclude that the circuit court's authority to sanction [the guardian ad litem] for noncompliance with its substantive order directing the disposition of the minors' settlement proceeds is more firmly grounded in Wis. Stat. ch. 785, specifically in § 785.03(1)(a) [(describing procedure for remedial sanctions)]."). The court of appeals concluded that the circuit court had actually imposed remedial sanctions in the case but did not follow the nonsummary procedures required under Wis. Stat. § 785.03(1)(a). *Id.*, ¶¶ 22, 25. Therefore, the court of appeals remanded the case to the circuit court with instructions to follow the procedures set forth in Wis. Stat. § 785.03(1)(a) and determine whether the original guardian ad litem's failure to deposit the minors' funds as ordered was intentional and therefore, qualified as contempt. *See id.*, ¶ 30. The court of appeals noted that, if the circuit court found the original guardian ad litem in contempt, it could then impose monetary remedial sanctions because the

---

[12] Failure to prosecute or comply with procedure statutes. For failure of any claimant to prosecute or for failure of any party to comply with the statutes governing procedure in civil actions or to obey any order of court, the court in which the action is pending may make such orders in regard to the failure as are just . . . .

Wis. Stat. § 805.03.

contempt would be continuing.[13] *Id.*, ¶ 22 ("So long as no properly restricted accounts containing the settlement proceeds existed, *[the] alleged contempt continued.*") (emphasis added).

¶ 67. In contrast, the most obvious case of a contempt of court that has been terminated and is no longer continuing occurs when the underlying dispute between the parties has been settled. For example, in *King,* under the pre-1979 contempt statutes, this court decided that the circuit court did not have the authority to conduct civil contempt proceedings after the principal action between the parties was settled and no longer continuing. *King,* 82 Wis. 2d at 138.

¶ 68. *King* was an opinion dealing with violations of an injunction that required certain state employees to refrain from picketing and other strike-related activities. *Id.* at 126. Three days after the strike was settled and the employees returned to work, the Attorney General commenced civil contempt proceedings against those state employees who violated the injunction. *Id.* at 127–28, 132. After noting the distinctions between civil and criminal contempt,[14] *id.* at 129–30,

---

[13] The court of appeals suggested what the monetary remedial sanctions should be if the circuit court found contempt:

> [The sanctions] may include, under § 785.04(1)(a), requiring [the original guardian ad litem] to compensate the minors for their losses suffered as a result of her contempt and requiring her to pay the costs of procuring the restoration of the minors' funds. If the court deems additional monetary sanctions necessary or appropriate, such sanctions must be tied to the purposes set forth in paragraphs § 785.04(1)(c)-(e).

*Evans,* 267 Wis. 2d 596, ¶ 30. *But see id.,* ¶ 28 (refusing to vacate, as a remedial sanction, the original guardian ad litem's attorney fees, which were earned by negotiating the settlements).

[14] *Civil contempt looks to the present and future* and the civil contemnor holds the key to his jail confinement by compliance

the supreme court held that civil contempt proceedings were inappropriate under these facts because the strike was no longer continuing and "[t]he only purpose for a contempt action brought at the time the contempt was sought in these cases was punishment to vindicate the authority of the court," *id.* at 132. The court did state, however, that "the acts complained of could have been the basis for criminal contempt," and "all the indicia of contempt point toward criminal contempt." *Id.* at 131. In fact, the court explained, "These cases would have presented no foreseeable problems if they had been brought as criminal contempt." *Id.* at 131–32.

¶ 69. The *King* court rejected the state's theory of a third category of contempt, a hybrid approach that would allow punitive sanctions in civil contempt. *Id.* at 134. Its decision was aided by the legislature's determination to "no longer recognize[] punitive sanctions for civil contempt" after 1975. *Id.* at 134–35 (citing Wis. Stat. § 295.02(5) (1975–76) ("No person may be imprisoned, nor required to pay any sum of money to the court or to a party, under this chapter except as specified in subs. (1) and (2) [(concerning remedial and coercive sanctions but not punitive sanctions)].")).

¶ 70. The plaintiff class in this case relies on *Frisch,* a case decided just two years ago by this court. In *Frisch,* the underlying dispute was related to child

---

with the order. On the other hand, the *criminal contemnor is brought to account for a completed past action,* his sentences are not purgeable and are determinate. *Criminal contempt is punitive.* It is *not intended to force the contemnor to do anything for the benefit of another party.*

*King,* 82 Wis. 2d at 130 (footnote omitted) (emphasis added); *see also, supra,* ¶ 50 n.4 (explaining the relationship between criminal and civil contempt with punitive and remedial sanctions, respectively).

support and the disclosure of the father's financial information. *Frisch,* 304 Wis. 2d 1, ¶ 6. In particular, the divorce judgment between the father and mother incorporated their settlement agreement, which required the father to provide the mother with a copy of his tax returns and all supporting schedules. *Id.* The required tax information would permit the mother to monitor the father's financial situation and to seek modifications in the support payments if warranted. *Id.*, ¶ 4. After the father failed to disclose his tax returns, which would have shown a substantial increase in income, the mother initiated contempt proceedings. *Id.*, ¶ 7. The court dismissed the contempt proceedings but revised the father's payment schedule and reiterated his financial disclosure obligations. *Id.*, ¶¶ 7–8. This time, however, the court ordered the father to make his tax returns and schedules available to the mother "by May 12 of each year as long as he had an ongoing child support obligation." *Id.*, ¶ 8.

¶ 71. After many months of court proceedings, the mother was forced to move for contempt again, alleging that the father had failed to make the necessary financial disclosures. *Id.*, ¶ 12. However, before a finding of contempt could be made, the father complied with the financial disclosure order and produced his tax returns for the mother. *Id.*, ¶¶ 14, 26. Despite the father's belated attempt at compliance, the circuit court found him in contempt and imposed a $100,000 sanction against him. *Id.*, ¶ 23. On appeal, the court of appeals concluded that a remedial sanction was improperly imposed against the father because he had complied with the circuit court's order before it found him in contempt. *Id.*, ¶ 26. As the contempt was no longer continuing, the court of appeals concluded, the circuit

court was without authority to impose a remedial sanction against the father. *Id.*

¶ 72. On review, this court reinstated the imposition of the remedial sanction against the father for his repeated failure to abide by the court's order requiring the timely disclosure of his tax return information. *Id.,* ¶ 4. The sole dispute in relation to the contempt issue was "whether remedial contempt was properly employed in this case because [it is] dispute[d] whether [the father's] contempt was continuing at the time the circuit court found [him] in contempt." *Id.,* ¶ 37; *see also id.,* ¶ 53 ("[T]he real question today is whether the contempt is continuing."). The court answered this question in the affirmative. Specifically, this court stated the following about the father's belated attempt at compliance and how it did not suffice to terminate his contempt of court:

> Although [the father] did produce all the required documents before the circuit court found him in contempt, *his contempt was continuing . . .* because his production of documents came too late to undo the problems he had created by failing to produce documents on time. . . . *Failure to timely produce income information 'as required' was really the essence of [the father's] contempt because it shielded him from exposure to regular, contemporary court-ordered modifications of child support.* If [he] had supplied the information timely, he would likely have been paying more support than he did. By his repeated failures, [the father] deprived [the mother] of the information necessary to seek the periodic modification of support she was entitled to request under the law, and he deprived the court of its authority to timely modify its child support order. *The contempt was continuing because [the father's] failure to comply with the court order deprived [the mother] of her ability to utilize traditional remedies in the law.*

*Id.,* ¶ 47 (emphasis added).

114

¶ 73. In *Frisch,* the father paid all the child support that the court had ordered. *See id.,* ¶ 23. But he did not pay all the child support he would have had to pay if he had complied with the court's order by disclosing his tax returns by May 12 of each year. *Id.,* ¶ 23 n.10. Timely disclosure was the essence of the order. *Id.,* ¶ 47. Delinquent disclosure was ineffectual because it deprived the mother of her traditional remedies in the law, as the court was blocked by statute from retroactively modifying the father's child support obligations. *Id.*

¶ 74. In the present case, the circuit court found that the County had been in contempt of court, that is, the County had violated the 30–Hour Rule component of the Consent Decree in the past. But the court found, and the plaintiff class conceded, that the 30–Hour Rule was not being violated in May, June, July, August, or September 2004, meaning that none of the members of the plaintiff class had a complaint that they were being detained in violation of the 30–Hour Rule at the time the motion for contempt was filed. In short, the County's contemptuous conduct was no longer continuing,[15] and

---

[15] Under the statute, the key to whether the circuit court may impose a remedial sanction is the word "continuing." The dissent attempts to undercut the significance of the word "continuing" by avoiding the past tense of the word, namely, "continued" and instead using the past tense of the word "is," namely, "was." *See* dissent, ¶¶ 109–10 ("[T]he County's contempt was continuing[, i.e., it *continued*] for almost three years. Why therefore does this case not present a case of *continuing* contempt?") (emphasis added). However, the phrase "was continuing," does not connote the same meaning as the word "continuing." To illustrate, the Thirty Years War *continued* or "*was continuing*" for 30 years, but the Thirty Years War is not *continuing*. For the same reason, we can say the County's

there is no suggestion that the County has violated any part of the Consent Decree since April 2004.[16] Thus, we are left with the question of whether the circuit court, under these circumstances, had the statutory authority to impose a *remedial* sanction of any sort against the County for its past contempt. The answer to this question is "No."

¶ 75. Because the County's violation of the Consent Decree had indisputably terminated before the contempt proceedings began, there is no way we can justify the plaintiff class's request for monetary damages on grounds of "a continuing [or persistent or uninterrupted] contempt of court." Wis. Stat. § 785.01(3); *The American Heritage Dictionary, supra,* at 408; *Blacks Law Dictionary, supra,* at 316; *see also King,* 82 Wis. 2d at 132 (disallowing the maintenance of civil contempt proceedings because the contemptuous conduct was terminated prior to the initiation of the contempt proceedings). As the County's contempt was not continuing, the court could not impose a remedial sanction against the County "for the purpose of terminating a continuing contempt of court." Wis. Stat. § 785.01(3); *see also* Note, § 11, ch. 257, Laws of 1979, at 1355 ("[A] remedial sanction is appro-

---

contempt *continued* or "*was continuing*" for almost three years, but the County's contempt *is not continuing.*

[16] The dissent suggests that this decision permits the County to resume violations of the Consent Decree without fear of penalty as long as the County ceases its violations before any party is able to file a motion for contempt. *See* dissent, ¶¶ 97, 111. Although we do not decide this issue on hypothetical facts not before us, we note that repeated violations of a court order after a finding of contempt may constitute a continuing contempt, and the circuit court has statutory authority to issue an "order designed to ensure compliance with a prior order of the court." Wis. Stat. § 785.04(1)(d).

priate only when the contempt is continuing . . . .");
*D.L.D.,* 110 Wis. 2d at 179 ("A remedial sanction means a
sanction imposed for the purpose of terminating a con-
tinuing contempt of court.") (internal quotations omit-
ted); *B.L.P.,* 118 Wis. 2d at 42 (stating that remedial
sanctions are imposed only to terminate a continuing
contempt of court). In fact, the principal objective that
would be served by the imposition of a contempt sanction
in this case now would be the punishment of the County
and the vindication of the circuit court's authority—both
of which are punitive sanction objectives. *See* Wis. Stat.
§ 785.01(2); *Frisch,* 304 Wis. 2d 1, ¶ 34; *Griffin,* 141
Wis. 2d at 708; *Evans,* 267 Wis. 2d 596, ¶ 21; *Diane K.J.,*
196 Wis. 2d at 969; *B.L.P.,* 118 Wis. 2d at 42; Martineau,
*supra,* at 694.

■

¶ 76. This is not a case where a contempt of court
causes irreparable harm by depriving a victim of her
"ability to utilize traditional remedies in the law."
*Frisch,* 304 Wis. 2d 1, ¶ 47. For instance, the plaintiff
class may be able to seek damages under 42 U.S.C.
§ 1983 (2006). With adequate proof, individual plain-
tiffs may be able to recover damages in personal injury
suits.[17] The County's contempt of court cannot be said
to have deprived the plaintiff class of its "traditional
remedies in the law," and consequently, we cannot say
the County's contempt is continuing on that basis. *See
Frisch,* 304 Wis. 2d 1, ¶ 47.

¶ 77. Finally, simply because the monetary reme-
dial sanctions set forth in Wis. Stat. § 785.04(1)(a) do

---

[17] In a significantly different fact situation, an appropriate
authority may seek a punitive sanction and request that proba-
tion be imposed upon the contemnor in place of imprisonment,
and then seek restitution as a condition of probation. *See* Wis.
Stat. §§ 785.04(2)(a) and 973.09(1)(a).

not expressly recognize that they can be imposed only "for the purpose of terminating a continuing contempt of court" does not carry the day for the plaintiff class. *See* Wis. Stat. § 785.01(3). All the sanctions listed under Wis. Stat. § 785.04(1) carry the label of "Remedial sanction." "Remedial sanction" is a defined term that *"means a sanction imposed for the purpose of terminating a continuing contempt of court."* Wis. Stat. § 785.01(3) (emphasis added). Because the definition of "remedial sanction" is clear on its face, we are "not at liberty to disregard the plain, clear words of the statute." *Kalal*, 271 Wis. 2d 633, ¶ 46 (internal quotations and citation omitted). Therefore, regardless of whether all the remedial sanction provisions contained in Wis. Stat. § 785.04(1) expressly recognize that they can be imposed *only* "for the purpose of terminating a continuing contempt of court," Wis. Stat. § 785.01(3), the fact that they are "remedial sanction[s]" and the definition of "remedial sanction" clearly requires a continuing contempt of court means that, to impose any sanction listed under Wis. Stat. § 785.04(1), there must be a "continuing contempt of court," *see* Wis. Stat. § 785.01(3).[18]

---

[18] The dissent offers an alternative interpretation for the definition of remedial sanction under Wis. Stat. § 785.01(3): "A contempt is a continuing one and is not terminated as long as the loss or injury to the victim of the contempt has not been compensated." Dissent, ¶ 112. First, this interpretation eviscerates the distinction between remedial and punitive sanctions found in Wis. Stat. ch. 785. More specifically, however, the dissent's interpretation would mean that a party's contempt would not cease until remedial sanctions—better termed "compensatory sanctions" under such circumstances—were actually imposed. According to that interpretation, two outcomes are possible: (1) the circuit court would be required to impose remedial sanctions, thus depriving the court of its discretion under Wis. Stat. § 785.02; or (2) the circuit court would refuse

¶ 78. Inasmuch as the County's contempt of court had ceased and was no longer continuing at the time the contempt proceedings were initiated, remedial sanctions could not be imposed. Consequently, we affirm the circuit court's judgment denying the plaintiff class remedial sanctions in this case.

B. Breach of the Consent Decree

¶ 79. As an alternative to requesting monetary compensation as a remedial sanction, the plaintiff class seeks monetary damages for breach of the Consent Decree. The plaintiff class seeks monetary damages for emotional distress suffered by inmates on account of the breach. The circuit court denied this request, primarily on grounds that "[m]onetary damages for a violation of the Consent Decree are not even mentioned in the agreement."

¶ 80. The circuit court found that "the parties did not enter into the Consent Decree with the expressed intention of creating the opportunity for the award of damages . . . . [Moreover, t]he class action complaint was filed seeking declaratory judgment or injunctive relief. Nowhere in the complaint are monetary damages requested or mentioned."

¶ 81. The circuit court quoted the plaintiffs' trial counsel three different times as saying that the case was not about damages. The court said that monetary damages for breach of the Consent Decree "are inappropriate by the very terms of the agreement and by the

to impose remedial sanctions and the contemnor would remain in contempt of court indefinitely because "the victim of the contempt has not been compensated." *Id.* Therefore, the dissent's interpretation would not only ignore the definition of "continuing" but also would lead to absurd results.

119

nature of the pleadings of this action. The court will not exercise its equitable powers to award monetary damages when the language of the Consent Decree clearly does not provide for them."

¶ 82. Monetary damages were not the objective of this class action suit. The original plaintiff, Christensen, filed a pro se *writ of prohibition* in March 1996. In July 1996, Christensen amended his complaint, with the assistance of counsel, to bring a class action under Wis. Stat. § 803.08. In October 1996, the class was certified by Judge Schellinger. "The determination that a class action is appropriate is discretionary with the trial court." *Preloznik v. City of Madison*, 113 Wis. 2d 112, 125, 334 N.W.2d 580 (Ct. App. 1983) (citing *Mercury Records Prods., Inc. v. Econ. Consultants, Inc.*, 91 Wis. 2d 482, 491, 283 N.W.2d 613 (Ct. App. 1979)). A party that radically alters its position after it has successfully invoked a court's exercise of discretion should anticipate that the court will bind the party to its prior position.

¶ 83. In May 2001, Judge Donegan approved the 48–page Consent Decree. Judge Fiorenza found that the Consent Decree was the product of extensive negotiation among the parties. That decree, she determined, did not contemplate monetary damages. "Damages in breach of contract cases are ordinarily measured by the expectations of the parties." *Handicapped Children's Educ. Bd. v. Lukaszewski*, 112 Wis. 2d 197, 206, 332 N.W.2d 774 (1983).

¶ 84. Even if we were able to overlook these clear deficiencies, we would not approve monetary damages in this case. The plaintiff class claims damage "for humiliation, emotional distress, and mental anguish." In essence, these are damages in tort for a purported breach of contract.

120

¶ 85. The plaintiff class contends that the County could reasonably foresee that damage of this nature would result from holding prisoners for more than 30 hours without a bed and that "[m]onetary damages are the most effective remedy to put the victims of this breach in the position they would have been in had the settlement agreement not been breached . . . ." The plaintiff class points to Restatement (Second) of Contracts § 353 (1981), "Loss Due to Emotional Disturbance," which provides the following: "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result."

¶ 86. Wisconsin has not adopted § 353 of Restatement (Second) of Contracts. On the contrary, the court has stated that mental suffering, while recognized as an injury, "has been held not a proper element of recoverable damages in actions on contract." *Koerber v. Patek,* 123 Wis. 453, 464, 102 N.W. 40 (1905). The antiquity of the cited case does not negate the validity of the principle. *See Bourque v. Wausau Hosp. Ctr.,* 145 Wis. 2d 589, 596 n.2, 427 N.W.2d 433 (Ct. App. 1988) (citing *Mursch v. Van Dorn Co.,* 627 F. Supp. 1310, 1317 (W.D. Wis. 1986)).

¶ 87. Moreover, even if we adopted § 353 of Restatement (Second) of Contracts, the plaintiff class still would not be able to recover for emotional distress. In particular, Comment a. to § 353 of Restatement (Second) of Contracts reads in part:

> *Damages for emotional disturbance are not ordinarily allowed.* Even if they are foreseeable, they are often particularly difficult to establish and to measure. *There are, however, two exceptional situations where such dam-*

121

ages are recoverable. In the first, the disturbance accompanies a bodily injury. In such cases the action may nearly always be regarded as one in tort . . . . *In the second exceptional situation, the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. . . .* [I]f the contract is not one where this was a particularly likely risk, there is no recovery for such disturbance.

(Emphasis added.) The plaintiff class has not provided sufficient evidence of compensable injuries to overturn the circuit court's decision to deny the claim. *Cf. Pleasure Time, Inc. v. Kuss,* 78 Wis. 2d 373, 387, 254 N.W.2d 463 (1977) ("[T]he burden rests on the [plaintiff] to prove by credible evidence to a reasonable certainty that damages were suffered and to establish at least to a reasonable probability the amount of these damages."). The plaintiff class has also failed to demonstrate that this contract "is of such a kind that serious emotional disturbance was a particularly likely result." Restatement (Second) of Contracts § 353 cmt. a.

¶ 88. Although we acknowledge that some members of the plaintiff class may have suffered bodily injury, isolated incidents of bodily injury, even if proven, are nearly inevitable in a jail population of approximately 150,000 people over the period of three years (March 2001 to April 2004). Generalized claims of such injuries do not support an award of contract damages for widespread emotional disturbance among the 16,000 members of the class.

## IV. CONCLUSION

¶ 89. We conclude, based on the facts of this case, that the circuit court had no discretion to impose a *remedial* sanction against the defendants after their contempt of court had ceased. Remedial sanctions are "imposed for the purpose of terminating a *continuing*

122

contempt of court." Wis. Stat. § 785.01(3) (emphasis added). Punitive sanctions may be "imposed to punish a *past* contempt of court." Wis. Stat. § 785.01(2) (emphasis added). Because breaches of the Consent Decree had ceased before the action for contempt was filed, the circuit court was correct in refusing to impose a *remedial* sanction against the defendants for their past contempt. For multiple reasons, we also conclude that the plaintiff class is not entitled to monetary damages for emotional distress for breaches of the Consent Decree. Consequently, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 90. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). This case involves the civil rights of individuals who were arrested and confined in the booking area of the Milwaukee County jail. These arrested persons (not convicted of any crime and presumed innocent) alleged (without direct contradiction) that they were held for more than 30 hours awaiting booking, crowded into cold cells without blankets, sitting up or lying down on cell floors splashed with bodily fluids, sleeping next to urinals, confined in an unsanitary and bug-infested space. The circuit court found that thousands of inmates were held in these conditions for more than two days. Hundreds were held for more than three days. Some were even held in excess of 100 hours.

¶ 91. You do not see these substandard and dangerous conditions on TV when booking is portrayed. But these conditions apparently existed right here in Milwaukee, Wisconsin.[1]

---

[1] The circuit court found the government officials in contempt for a "staggering" pattern of confining thousands of

¶ 92. The Legal Aid Society of Milwaukee, Inc., representing these arrestees, sued the County and officials (collectively referred to as the County in the majority opinion and here) for maintaining such conditions. The circuit court for Milwaukee County entered an order, a Consent Decree, in which the County agreed to correct various conditions. Under the Consent Decree arrested persons could be kept in the booking area (without beds) for not more than 30 hours. At no time since the entry of the Consent Decree did the County seek relief from the decree because the requirements proved to be too onerous or impractical. Nevertheless the County violated the Consent Decree for nearly three years.

¶ 93. The circuit court found that the County intentionally violated the 30–hour provision of the court's Consent Decree on 16,662 occasions over nearly a three-year period, November 2001 to April 2004, keeping inmates in the booking area longer than 30 hours without assigning them to a bed.[2] The County did not challenge this finding in the court of appeals or in this court.

---

people in the jail's booking area in "unacceptable, if not appalling" conditions for extended periods in direct violation of the explicit terms of the consent decrees.

[2] Majority op., ¶ 35: "The circuit court found that the 'staggering number of violations and extended period of time during which the violations occurred were clear evidence that the violations were 'intentional.' "

Neither the court of appeals nor this court has been asked to review the circuit court's determination that the County was in contempt of the consent decree. Relevant to the present case, the contempt statute defines "[c]ontempt of court" to mean "intentional . . . [d]isobedience, resistance or obstruction of the authority, process or order of a court." Wis. Stat. § 785.01(1)(intro) & (1)(b). The court of appeals has stated that "[a] finding of

¶ 94. After the Legal Aid Society sought discovery in April 2004 to prove violations of the Consent Decree, the County immediately remedied the conditions and began obeying the court order.[3] In July 2005 the Legal Aid Society asked the circuit court to hold the County in contempt of court for intentionally failing to obey the court order. The circuit court so held.

¶ 95. The circuit court also held that even though the County intentionally violated the court order and was in contempt of court, the circuit court could not award monetary damages under chapter 785 of the statutes as a remedial sanction.

¶ 96. The issue before this court, stated in general terms, is the power of a circuit court to ensure compliance with its orders. More specifically, the issue before this court is the power of a circuit court to ensure compliance with its order by awarding monetary damages for a party's intentional violation of a court order that constitutes contempt of court.

¶ 97. The majority opinion holds that because a remedial sanction is statutorily defined as "a sanction imposed for purposes of terminating a *continuing* contempt of court," Wis. Stat. § 785.01(3) (emphasis added), a circuit court is powerless to impose the sanction of compensatory damages provided in § 785.04(1)(a) "when breaches of the Consent Decree had ceased before the action for contempt was filed."[4] In other words, under the majority opinion if the contempt of court lasts for

contempt rests on the trial court's factual findings. The critical findings are that the party was able to comply with the order and that the refusal to comply was willful and with intent to avoid compliance." *Evans v. Luebke,* 2003 WI App 207, ¶ 24 n.12, 267 Wis. 2d 596, 671 N.W.2d 304.

[3] Majority op., ¶¶ 30, 35.

[4] Majority op., ¶ 4. *See also id.,* ¶¶ 74, 75.

nearly three years and ceases before the motion for contempt is filed, a court cannot require the contemnor to pay "a sum of money sufficient to compensate a party for loss or injury suffered by the party as the result of a contempt of court" as provided in Wis. Stat. § 785.04(1)(a). Thus in the present case, according to the majority opinion, the County can violate the circuit court order without penalty for two and one half years and may even be free to do so again so long as the County again stops the violations before a motion for contempt is filed.[5]

¶ 98. I write separately, agreeing with the court of appeals that monetary damages are permitted under the statute in the present case. I would remand the

[5] Without deciding the issue, the majority opinion suggests that although the County was able to terminate its contempt of court (and preclude the use of remedial sanctions) by ceasing its repeated violations of the court order before a motion for contempt was filed, the County might be unable to do the same thing a second time. *See* majority op., ¶ 74 n.16 ("[R]epeated violations of a court order after a finding of contempt may constitute a continuing contempt . . . ."). In other words, the majority opinion suggests that under the contempt statute a contemnor has one freebie opportunity—but "may" not have two freebie opportunities—to repeatedly violate a court order with impunity prior to a motion for contempt.

The majority opinion also seems to imply that if the County resumes violating the court order and again ceases its violations before a motion for contempt is filed, the circuit court may exercise its authority under Wis. Stat. § 785.04(1)(d) "to issue an 'order designed to ensure compliance with a prior order of the court.' " Majority op., ¶ 74 n.16 (quoting Wis. Stat. § 785.04(1)(d)). Section 785.04(1)(d), however, is a remedial sanction and under the majority opinion's reasoning may not be used except for the purpose of terminating a continuing contempt of court.

cause to the circuit court to determine the sum of money, if any, sufficient to compensate the persons held in violation of the Consent Decree for the loss or injury suffered.[6]

¶ 99. I reach this conclusion for several reasons. First, the majority opinion's interpretation of the phrase "remedial sanction" in chapter 785 of the statutes is erroneous as a matter of statutory interpretation. The interpretation of the statute is inconsistent with the text of chapter 785 of the statutes, represents a sharp break from the traditional law of contempt in Wisconsin, is contrary to the statutory and legislative history, and produces an absurd result. Two years ago, the court declared that "the intent behind the contempt statute . . . is to provide the court with a mechanism, or toolbox, to effect compliance with court orders."[7] Today, the court removes tools from the toolbox, tools that are needed to effect compliance with court orders, and eviscerates the function of the contempt statute and the circuit court's authority to enforce its own orders.

¶ 100. Second, the interpretation contravenes *Frisch v. Henrichs,* 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85, a case decided a mere two years ago.

¶ 101. Third, if chapter 785 is to be interpreted to create a void in a court's power to enforce an order through contempt, I conclude that a circuit court may award compensatory damages under its inherent powers over contempt in a case that falls into the statutory void.

---

[6] The circuit court concluded as a matter of law that remedial sanctions were not available under the circumstances of the present case. The circuit court therefore never determined what sum of money, if any, would be sufficient compensation.

[7] *Frisch,* 2007 WI 102, ¶ 82, 304 Wis. 2d 1, 736 N.W.2d 85.

¶ 102. Chapter 785 has to be interpreted in light of the texts of Wis. Stat. § 785.01(3) and § 784.04(1)(a), the context and structure of the chapter, the statutory and legislative history of the chapter, contempt law in Wisconsin, and the purpose of the contempt statute.

¶ 103. Section 785.01(3) provides: " 'Remedial sanction' means a sanction imposed for the purpose of terminating a continuing contempt of court."

¶ 104. Section 785.04(1)(a) provides in relevant part: "A court may impose one or more of the following remedial sanctions: (a) Payment of a sum of money sufficient to compensate a party for a loss or injury suffered by the party as the result of a contempt of court."

¶ 105. A plain reading of Wis. Stat. § 785.04(1)(a) is that the circuit court may order contemnors to compensate others for losses or injuries suffered as a result of a contempt of court. Wisconsin Stat. § 785.04(1)(a) explicitly authorizes payment of money to compensate a victim "for a loss or injury *suffered* by the party as the result of a contempt of court" (emphasis added). The word "suffered" makes sense only if Wis. Stat. § 785.04(1)(a) applies to payment for losses or injuries that already have occurred and that resulted from past conduct.

¶ 106. Relying on the "clear language of the statute," Judge Fine wrote in his concurring opinion in the court of appeals decision in the present case: "Under Wis. Stat. § 785.04(1)(a)'s forthright and unambiguous directive, the plaintiffs are entitled to be compensated for the

losses and injuries they suffered as a result of Milwaukee's clear and blatant contempt."[8]

¶ 107. The majority opinion recognizes the validity of this interpretation. It states that "[s]tanding alone, [Wis. Stat. § 785.04(1)(a)] could be interpreted as allowing payment of a sum of money for a loss or injury suffered in the past . . . ."[9]

¶ 108. The majority opinion nevertheless concludes that Wis. Stat. § 785.04(1)(a) should not be interpreted according to its plain meaning, in light of Wis. Stat. § 785.01(3)'s definition of a remedial sanction as a sanction imposed for the purpose of terminating a "continuing" contempt.

¶ 109. The court therefore must determine the meaning of the statutory phrase "a continuing contempt." This phrase is not defined in the statute. The majority opinion concedes that the word "continuing" has many dictionary meanings and selects the meaning "to go on with a particular action."[10] Of course, here the County did "go on with a particular action" for nearly three years.

¶ 110. In ordinary, plain English, the County's contempt was continuing for almost three years. Why therefore does this case not present a case of continuing

---

[8] *Christensen v. Sullivan,* 2008 WI App 18, ¶ 25, 307 Wis. 2d 754, 746 N.W.2d 553 (Fine, J., concurring).

[9] Majority op., ¶ 58.

[10] Majority op., ¶ 60.

"[R]esort to a dictionary can be, as Justice Scalia has written of the use of legislative history, 'the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.' " *Noffke v. Bakke,* 2009 WI 10, ¶ 60, 315 Wis. 2d 350, 760 N.W.2d 156 (Abrahamson, C.J., concurring) (quoting *Conroy v. Aniskoff,* 507 U.S. 511 (1993)).

contempt? Where in the statute does it say that the contempt has to continue after the motion for contempt has been filed? Ah, says the majority opinion, by statutory definition (Wis. Stat. § 785.01(3)) the remedial sanction has to "terminate a continuing contempt," and here the County "terminated" its own continuing contempt by obeying the court order.

¶ 111. The majority opinion's reading of Wis. Stat. § 785.01(3) creates an unnecessary conflict between § 785.01(3) and § 785.04(1)(a); renders meaningless § 785.04(1)(a)'s specific grant of authority to a court to award compensatory damages to those who have suffered a loss or injury as a result of a party's contempt of court; and allows the contemnor to repeatedly violate a court order and to inflict harm without fear of being required to compensate its victims so long as the contemnor ceases violations before a motion for contempt is filed.

¶ 112. There is an alternative interpretation of the language in Wis. Stat. § 785.01(3) defining a remedial sanction as a sanction "imposed for the purpose of terminating a continuing contempt": A contempt is a continuing one and is not terminated as long as the loss or injury to the victim of the contempt has not been compensated. This interpretation of the contempt statute harmonizes Wis. Stat. § 785.01(3) and § 785.04(1)(a) and is consistent with the purposes of contempt.[11]

---

[11] Contrary to the majority opinion's assertion at ¶ 77 n.18, this interpretation preserves the distinction between remedial and punitive sanctions. Punitive sanctions are imposed for the purpose of punishment, do not involve compensation to a victim, and may be imposed whether or not any harm to the victim has been remedied. *See* Wis. Stat. § 785.01(2) (defining "punitive sanction" as a sanction "imposed to punish a past

¶ 113. One purpose of a remedial sanction in a civil contempt proceeding is to enforce an individual litigant's rights by ensuring a remedy for the litigant.[12] Monetary damages in a contempt action may serve two purposes: (1) to compensate the individuals for loss or injury suffered, and (2) to deter the disobedient party from engaging in similar illegal conduct in the future. Thus monetary damages are consistent with the purpose of remedial contempt sanctions which, as the

contempt of court for the purpose of upholding the authority of the court"); Wis. Stat. § 785.04(2) (listing only fines and imprisonment as the sanctions that a court may use for a punitive purpose).

Nor does this interpretation eliminate a court's discretion to impose remedial sanctions. Nothing in chapter 785 requires a court to impose a sanction in every instance that a party is in contempt of court. Section 785.02 states that "[a] court of record *may* impose a remedial or punitive sanction for contempt of court under this chapter" (emphasis added).

[12] *See Schroeder v. Schroeder,* 100 Wis. 2d 625, 637, 302 N.W.2d 475 (1981) (stating that a contempt sanction "seek[ing] to enforce a private right of one of the parties in an action is a civil [rather than criminal or punitive] contempt" sanction (quoting *State v. King,* 82 Wis. 2d 124, 129, 262 N.W.2d 80 (1978))); *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 828 (1994) ("[A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." (quotation marks and citation omitted)).

*See also* Margit Livingston, *Disobedience and Contempt,* 75 Wash. L. Rev. 345, 345 (2000) ("Courts use contempt citations to compensate injured parties, [and to] coerce reluctant defendants and witnesses . . . ."); Dan B. Dobbs, *Contempt of Court: A Survey,* 56 Cornell L. Rev. 183, 235 (1971) ("If the contempt proceeding is a civil one, its purpose is remedial—that is, its purpose is to compel obedience to the court's order, or, failing that, to get some substitute relief for the benefit of the opposing party." (footnote omitted)).

majority opinion acknowledges, are imposed for the benefit of the litigant and to procure present and future compliance with court orders.[13]

¶ 114. Although the majority opinion acknowledges the conflict between § 785.04(1)(a)'s plain language authorizing compensation as a remedial sanction and the statutory definition of "continuing contempt," it strangely declares that "the definition of 'remedial sanction' is clear on its face." Majority op., ¶ 77.

¶ 115. If Wis. Stat. § 785.01(3) were clear on its face, Justice Prosser would not have needed to write two lengthy opinions in the course of two years attempting to explain what Wis. Stat. § 785.01(3) means.[14]

¶ 116. The statutory and legislative history of chapter 785 helps resolve any perceived conflict between § 785.04(1)(a)'s express authorization of compensatory damages as a remedial sanction for contempt and 785.01(3)'s definition of remedial sanctions as a sanction imposed for the purpose of terminating a continuing contempt.

¶ 117. Before the 1979 repeal and recreation of chapter 785 a court's authority to impose the sanction of compensatory damages in a civil[15] contempt proceed-

---

[13] Majority op., ¶ 55.

[14] For the other decision interpreting Wis. Stat. § 785.01(3), see *Frisch v. Henrichs,* 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85, which I discuss in Part II of this dissent.

[15] A court may determine whether to impose a "remedial" contempt sanction in an ordinary civil proceeding. In contrast, when determining whether to impose a "punitive" contempt sanction, a court ordinarily must comply with the statutes governing criminal procedure. *Compare* Wis. Stat. § 785.03(1)(a) (stating that a court may impose a remedial contempt sanction upon a motion from a party and after notice and a hearing) *with* Wis. Stat. § 785.03(1)(b) (stating that when a punitive sanction is

ing did not depend upon whether the sanction served the purpose of terminating a continuing contempt of court. Every version of the Wisconsin Statutes from 1849 through 1977 stated that the sanction of compensatory damages could be imposed in a civil contempt proceeding.[16] No version of the contempt statutes limited a court to using the sanction of compensatory damages as a means of terminating a continuing contempt of court. Indeed, in 1906 this court stated that the statutes relating to civil contempt proceedings sought "to indemnify parties to the action for their actual loss or injury" as well as "to compel the performance of duties still within the contemnor's power."[17]

---

sought, the district attorney, attorney general, or a special prosecutor must issue a complaint charging the alleged contemnor with contempt of court and that such complaint "shall be processed under chs. 967 to 973 [pertaining to matters of criminal procedure]").

[16] *See, e.g.,* Wis. Stat. ch. 115, § 21 (1849) ("If an actual loss or injury has been produced to any party by the misconduct alleged, the court shall order a sufficient sum to be paid by the defendant to such party, to indemnify him and to satisfy his costs and expenses . . . ."); Wis. Stat. § 295.02(1)(a) (1977) ("If an actual loss or injury has been produced to any party by the misconduct of the contemnor, which it is not efficacious to remedy by execution or garnishment, the court may order the defendant to pay such party a sum sufficient to compensate the party for losses, costs and expenses . . . .").

In 1979, prior to enacting the current contempt statute, the legislature renumbered chapter 295 of the statutes as chapter 785. *See* § 62, ch. 32, Laws of 1979.

[17] *Emerson v. Huss,* 127 Wis. 215, 224–25, 106 N.W. 518 (1906), *overruled on other grounds by State v. King,* 82 Wis. 2d 124, 262 N.W.2d 80 (1978).

*King* overruled the *Emerson* decision to the extent that *Emerson* permitted "imposition of punitive sanctions in civil contempt which have no remedial or coercive attributes." *King*

¶ 118. The pre-1979 contempt statutes were consistent with the law of other jurisdictions, which seem uniformly to recognize that contempt sanctions in a civil contempt proceeding may be imposed either for the purpose of terminating a continuing contempt or for the purpose of compensating a party for losses resulting from a contempt of court. The United States Supreme Court, for example, has stated that in civil contempt proceedings, sanctions "may, in a proper case, be employed for *either or both of two purposes:* to coerce the defendant into compliance with the court's order, *and to compensate the complainant for losses sustained.*"[18] Numerous state supreme courts follow the United States Supreme Court's approach.[19]

---

82 Wis. 2d at 134. The sanction of compensatory damages is not a "punitive" sanction. Chapter 785 includes the sanction of compensatory damages in its list of "remedial" sanctions and omits it from the list of "punitive" sanctions. *See* Wis. Stat. § 785.04(1)-(2). *See also* Doug Rendleman, *Compensatory Contempt: Plaintiff's Remedy When a Defendant Violates an Injunction,* U. Ill. L.F. 971, 972 (1980) ("Courts utilize compensatory contempt to restore the plaintiff as nearly as possible to his original position. The remedy is not penal, but rather remedial.").

 [18] *United States v. United Mine Workers,* 330 U.S. 258, 304 (1947) (emphasis added).

 *See also Int'l Union v. Bagwell,* 512 U.S. 821, 829, 838 (1994) ("A contempt fine . . . is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.' . . . Our holding . . . leaves unaltered the longstanding authority of judges . . . to enter broad compensatory awards for all contempts through civil proceedings." (quoting *Mine Workers,* 330 U.S. at 303–304)).

 [19] *See, e.g., In re Contempt of Dougherty,* 413 N.W.2d 392, 398 (Mich. 1987) ("[T]here are two types of civil contempt sanctions, coercive and compensatory. . . . Thus, there are three

¶ 119. The County correctly acknowledges that prior to 1979, "a [Wisconsin] court had the power to

sanctions which may be available to a court to remedy or redress contemptuous behavior: (1) criminal punishment to vindicate the court's authority; (2) coercion, to force compliance with the order; and (3) compensatory relief to the complainant."); *Odom v. Langston,* 213 S.W.2d 948, 951–52 (Mo. 1948) ("A proceeding for civil contempt has as its object remedial punishment by way of a coercive imprisonment, or a compensatory fine, payable to the complainant." (quotation marks and citation omitted)); *City of Cincinnati v. Cincinnati Dist. Council 51,* 299 N.E.2d 686, 694 (Ohio 1973) ("It is . . . well settled that 'judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.' " (citing *United Mine Workers,* 330 U.S. at 303)); *DeMartino v. Monroe Little League, Inc.,* 471 A.2d 638, 642 (Conn. 1984) (same); *Johnson v. Bednar,* 573 So. 2d 822, 824 (Fla. 1991) (same); *Hawaii Pub. Employment Relations Bd. v. Hawaii State Teachers Ass'n,* 520 P.2d 422, 427 (Haw. 1974) (same); *Mahoney v. Commonwealth,* 612 N.E.2d 1175, 1178–79 & n.9 (Mass. 1993) (same); *Bata v. Central-Penn Nat'l Bank,* 293 A.2d 343, 354 & n.21 (Penn. 1972) (same); *School Comm. v. Pawtucket Teachers Alliance,* 221 A.2d 806, 813 (R.I. 1966) (same).

*See also* Margit Livingston, *Disobedience and Contempt,* 75 Wash. L. Rev. 345, 347, 351–52 (2000) ("Civil contempt serves to benefit the plaintiff to the action by providing compensation or coercion. . . . Remedial civil contempts serve to compensate plaintiffs for damages suffered because of the defendant's disobedience of a court order. . . . Remedial civil contempt is merely another form of compensatory damages[.]" (footnote omitted)); Robert J. Martineau, *Contempt of Court: Eliminating the Confusion Between Civil and Criminal Contempt,* 50 U. Cinn. L. Rev. 677, 701 (1981) ("The payment of money damages is one of the traditional types of sanctions used in civil contempt to enforce the rights of a litigant." (footnote omitted)); Doug Rendleman, *Compensatory Contempt: Plaintiff's Remedy When a Defendant Violates an Injunction,* U. Ill. L.F. 971, 971 (1980)

order that damages be paid to indemnify a party for an injury resulting from a contempt of court" and that the pre-1979 versions of the contempt statute did not require "that the contempt be continuing for such damages to be available."[20] The County argues that the 1979 legislature intended to impose a new limit on a court's power to impose the contempt sanction of compensatory damages by requiring that the sanction not be imposed except for the purpose of terminating a continuing contempt of court.[21]

¶ 120. The legislative history tells a different story about the legislature's intent.

¶ 121. The 1979 contempt statutes were enacted in their present form as a result of the work of the Contempt and Extraordinary Remedies Committee of the Judicial Council.[22] The Judicial Council's notes appear as explanatory notes to chapter 257, § 11, Laws of 1979.

¶ 122. The Judicial Council Notes, available to the legislature as part of the bill during enactment of

("Compensatory contempt is a money award for the plaintiff when the defendant has injured the plaintiff by violating an injunction. Compensatory and coercive contempt are both civil sanctions.").

[20] Reply Brief of Petitioners at 2.

[21] Reply Brief of Petitioners at 3.

[22] The Judicial Council is a body legislatively created in 1951. Wis. Stat. § 758.13. Its notes are a legitimate, admissible source of insight into the legislative intent behind the statute. "Generally . . . reports or comments of nonlegislative committees are considered a valid aid in interpreting a statute which originated from such committee." *In re Haese's Estate,* 80 Wis. 2d 285, 297, 259 N.W.2d 54 (1977). *See also State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 69, 271 Wis. 2d 633, 681 N.W.2d 110 (Abrahamson, C.J., concurring).

the bill, advised the legislature that in repealing and recreating Chapter 785, the legislature was not changing the substantive law relating to contempt sanctions. The Notes explain that the 1979 contempt statute's definitions of "remedial" and "punitive" contempt reflect no "intent . . . to change the basic law of contempt."[23] The Notes also state that "[t]he sanctions listed in this section [785.04] are essentially the same as under prior law"[24] and identify a "remedial sanction" as the type of contempt sanction that traditionally could be imposed in a civil proceeding.[25] The Notes generally suggest that the 1979 contempt statute preserves the substantive law of the past rather than abolishing it.[26]

---

[23] Note 3 (Wis. Stat. § 785.01(3)), § 11, ch. 257, Laws of 1979, at 1355.

[24] Note (Wis. Stat. § 785.04), § 11, ch. 257, Laws of 1979, at 1357.

[25] *See* Note 2 (Wis. Stat. § 785.01), § 11, ch. 257, Laws of 1979, at 1355 ("Traditionally, a remedial sanction was the type of sanction imposed for civil contempt. . . . That concept is continued here, even though without the civil contempt designation.").

[26] At most, the Notes may show that the Judicial Council, while attempting to preserve the substantive law of contempt, misunderstood the purposes for which remedial sanctions historically had been imposed in civil contempt proceedings. The Notes state that traditionally, the purpose of a contempt sanction that could be imposed in a civil proceeding "was remedial in that [the sanction] was designed to force a person into complying with an order of the court and terminating a present contempt of court." Note 2 (Wis. Stat. § 785.01), § 11, ch. 257, Laws of 1979, at 1355. This description of the purpose for which contempt sanctions could be imposed in a civil proceeding is incomplete. As the County's reply brief correctly concedes, Wisconsin courts historically have been able to impose compensation as a sanction in civil contempt proceedings regardless of whether a contempt was "continuing" or could be terminated in response to a sanction.

¶ 123. The statutory and legislative history does not support the County's view, accepted by the majority, that Wis. Stat. § 785.01(3) reflects the legislature's intent to diminish the courts' authority to impose compensation as a contempt sanction. Rather, the history appears to show that the Judicial Council understood the 1979 contempt statute as leaving the courts' traditional powers intact. According to the statutory and legislative history, Wis. Stat. § 785.01(3) must not be read as limiting Wis. Stat. § 784.04(1)(a)'s provision authorizing compensation as a remedial contempt sanction.

¶ 124. In sum, as interpreted by the majority opinion, Wis. Stat. § 785.01(3) leaves the Wisconsin courts unable to impose the remedial contempt sanction of compensation except for the purpose of terminating a continuing contempt of court and "terminating

Retired Judge Gordon Myse, a member of the Contempt and Extraordinary Remedies Committee of the Judicial Council, and Professor Robert Martineau, a member of the Committee and Reporter for the Committee, filed a third-party brief with this court in support of the plaintiffs. *See* Non-Party Brief of Robert J. Martineau, Gordon G. Myse, David S. Schwartz, Vincent M. Nathan, and Pamela Susan Karlan.

I do not rely upon Judge Myse's or Professor Martineau's communications in the third-party brief as evidence of legislative intent. I agree with the County that after-the-fact statements by legislators and drafters of statutes should not be relied upon to interpret the meaning of a statute. *Labor & Farm Party v. Elections Bd.,* 117 Wis. 2d 351, 356, 344 N.W.2d 117 (1984) ("It is inappropriate . . . for a court to rely on the statements of a member of the legislature as to what the legislature intended when enacting a statute."). I note, however, that the court has, in the past, relied upon private communications between a member of the legislative council staff and a single legislator as evidence of legislative intent. *See Maurin v. Hall,* 2004 WI 100, ¶¶ 77, 89, 274 Wis. 2d 28, 682 N.W.2d 866.

a continuing contempt" is narrowly interpreted. This limitation on a court's contempt authority did not exist between 1849 and 1979 in Wisconsin and does not appear to exist in other jurisdictions. Moreover, the legislature apparently did not intend to change the substantive law of contempt sanctions when it repealed and recreated Chapter 785 in 1979. The interpretation of chapter 785 adopted by the majority opinion produces absurd results limiting the contempt power of a court. For all these reasons, I conclude that the majority opinion's interpretation of the statute is erroneous.

## II

¶ 125. Regardless of the correct interpretation of Wis. Stat. § 785.01(3), I agree with the court of appeals that the County's flagrant violations of the court order represent "a continuing contempt" under Wis. Stat. § 785.01(3) as the statute was interpreted and applied by this court in *Frisch v. Henrichs,* 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85.[27] The majority opinion significantly undercuts the *Frisch* decision.

¶ 126. The *Frisch* decision teaches that when a party is in contempt of the circuit court's order to perform actions by a specified time, the party cannot terminate its contempt by performing the required

---

[27] *See Christensen v. Sullivan,* 2008 WI App 18, ¶ 1, 307 Wis. 2d 754, 746 N.W.2d 553 ("When the trial court concluded that sanctions or compensation for continuing contempt were not available because Milwaukee County (County) had ceased violating the Consent Decree on which the trial court based its finding of contempt, it did not have the benefit of our supreme court's holdings in *Frisch v. Henrichs,* 2007 WI 102, 304 Wis. 2d 1, 736 N.W.2d 85, decided in July 2007, while this appeal was pending. We conclude that the remedy of sanctions under Wis. Stat. § 785.04 for continuing contempt, as described in *Frisch,* is applicable to the contempt found by the trial court here.").

139

actions too late to undo its intentional violation of the circuit court's command respecting timeliness. The *Frisch* lesson applies in the present case, and under the reasoning of *Frisch,* this case therefore falls within chapter 785's provisions relating to remedial contempt.

¶ 127. In *Frisch,* a circuit court order required an ex-husband to provide his ex-wife with certain tax information by May 12 of each year. At the time of the contempt hearing, the ex-husband had complied with the circuit court's order insofar as it required him to provide the tax information to his ex-wife but had not complied (and no longer could comply) with the court's order insofar as it required him to provide the information timely. Furthermore, the ex-husband's failure to provide the tax information timely had harmed the ex-wife in a way that the ex-husband could not cure by providing the information too late to comply with the circuit court order. Because of the ex-husband's conduct, the ex-wife had missed opportunities to seek timely modification of a child support order in her favor and likely had not received the full amount of child support to which she was entitled.

¶ 128. This court concluded, with Justice Prosser writing for the majority, that the ex-husband's contempt was continuing at the time of the contempt hearing because the husband could not undo his violation of the circuit court's order respecting timeliness and was in continuing violation of that portion of the order. The *Frisch* court stated that "[t]he timely provision of information was an essential element of the [circuit] court's order."[28] Furthermore, the husband's "[f]ailure to timely produce income information 'as required' was really the essence of [his] contempt

---

[28] *Frisch,* 304 Wis. 2d 1, ¶ 4.

because it shielded him from exposure to regular, contemporary court-ordered modifications of child-support."[29] Due to the ex-husband's contempt of the circuit court's order respecting timeliness, "full compliance with the court's order [was] impossible."[30] The *Frisch* court explained that the husband "could not and did not turn back time when he produced the required information too late to be acted on[.]"[31]

¶ 129. The contempt in the present case, like the contempt in *Frisch,* consists of an intentional failure to perform actions timely as required by the circuit court's order. The Consent Decree required the County to implement the 30–hour rule *"[a]s of 3/21/01, and thereafter[.]"*[32] At the time of the contempt hearing, the County had complied with the Consent Decree insofar as it required the County to implement the 30–hour rule but had not complied (and no longer could comply) with the Consent Decree insofar as it required the County to implement the 30–rule timely. Furthermore, the County's failure to implement the 30–hour rule timely harmed members of the plaintiff class in a way that the County could not cure by implementing the 30–hour rule too late to comply with the Consent Decree. Because of the County's conduct, many members of the plaintiff class were forced to spend more than 30 hours in the County jail without a bed, contrary to the Consent Decree's explicit mandate.

---

*See also id.,* ¶ 47 ("Producing documents was only part of the court's order. Producing documents on time ... was an equal part of the order.").

[29] *Id.*

[30] *Id.,* ¶ 62.

[31] *Id.,* ¶ 4.

[32] Majority op., ¶ 16 (emphasis added; quoting the Consent Decree).

¶ 130. The *Frisch* court's reasoning applies cleanly and clearly to the facts of the present case. The County cannot undo its violation of the Consent Decree's provision respecting timelines and is in continuing violation of that portion of the Consent Decree. Timely implementation of the 30–hour rule unquestionably was an essential element of the Consent Decree. Due to the County's contempt of the circuit court's order respecting timeliness, full compliance with the Consent Decree now is impossible. The County could not and did not turn back time when it implemented the 30–hour rule too late to benefit the many inmates who spent more than 30 hours in the County jail without a bed, contrary to the Consent Decree.

¶ 131. The only obvious difference between *Frisch* and the present case that might seem to matter under the majority opinion relates to when the contumacious conduct stopped relative to when the motion for contempt sanctions was filed. In *Frisch* the contemnor began complying with the court order after the motion for contempt was filed (but before a finding of contempt). In the present case the contemnor began complying with the court order about three years after the order but months before a motion for contempt was filed. The timing issue, however, was not even mentioned in *Frisch* and certainly was not determinative.

¶ 132. The majority opinion seems to distinguish *Frisch* by declaring that "[t]his is not a case where a contempt of court causes irreparable harm by depriving a victim of her 'ability to utilize traditional remedies in the law.' "[33] Majority op., ¶ 76 (quoting *Frisch,* 304

_____

[33] Without explanation, reasoning, or citation to authority, the majority cavalierly declares that the plaintiff class may be able to bring a 42 U.S.C. § 1983 action for damages and that

142

Wis. 2d 1, ¶ 47). *Frisch,* however, imposed no requirement that a contempt must deprive a plaintiff of any existing remedy under the law in order to be "continuing" and to trigger the possibility of compensatory sanctions. *Frisch* did not hold that all other potential avenues of relief must be exhausted before contempt sanctions are used. Indeed, the *Frisch* court stated that remedial contempt was properly employed although the ex-wife potentially could have been entitled to relief under Wis. Stat. § 806.07.[34]

¶ 133. The contempt statute offers no textual basis for the position that whether a contempt is "continuing" for purposes of Wis. Stat. § 783.01(3) depends on whether other remedies are available to the victim of contempt. The majority should not be distinguishing *Frisch* by rewriting the contempt statute, engrafting a requirement onto Wis. Stat. § 785.01(3) that is extrinsic to the statute and unsupported by the statute's text.

### III

¶ 134. If the majority opinion's statutory interpretation is accepted, the result is that a circuit court has no power to impose remedial compensatory damages to sanction a contumacious party for intentionally

---

individual plaintiffs may file personal injury lawsuits. It is not clear that the individual members of the class may bring their own actions for damages. The majority opinion decides the issue without analyzing claim preclusion, the federal Prisoner Reform Litigation Act and its state progeny, or other practical barriers to such suits. As a practical matter and as a matter of judicial administration I do not think it a good idea for the majority opinion to encourage 16,662 individuals to file individual actions or to suggest personal liability for public officials in the present case.

[34] *See Frisch,* 304 Wis. 2d 1, ¶ 27 n.12.

violating a court order for nearly three years, a clear contempt of court, so long as the party ceases its contumacious behavior before a motion for contempt sanctions is filed. Thus there is a void in the statute relating to a circuit court's power to protect enforcement of its orders. Under such circumstances, the circuit court may use its inherent power to fill the void in the contempt statutes.[35] Filling in a void in the statute does not contravene the statute.

¶ 135. "A court's power to use contempt stems from the inherent authority of the court" and a court's contempt power may not be "rendered ineffectual" by statute.[36] A court's power of contempt exists independently of and outside the statutes; courts have retained their inherent contempt power in addition to the statutory power prescribed by the legislature.[37] When the procedures and penalties for contempt are prescribed by statute, the statute controls as long as the statute does not render the court's power impotent or meaningless.[38] To the extent that the legislature unreason-

---

[35] As the majority opinion explains: "The statutory scheme establishes two kinds of sanctions, each with specific criteria. There may be a void in this statutory scheme . . . ." Majority op., ¶ 58 n.10. The majority concludes without analysis that this void cannot be filled by judicial interpretation without doing violence to the statutes. Yet the majority recognizes that the statute does not deprive a court of its inherent powers to protect enforcement of its order.

[36] *Frisch,* 304 Wis. 2d 1, ¶ 32.

[37] *In the Interest of D.L.D.,* 110 Wis. 2d 168, 178, 327 N.W.2d 682 (1983).

[38] *Evans v. Luebke,* 2003 WI App 207, ¶ 17, 267 Wis. 2d 596, 671 N.W.2d 302; *Douglas County v. Edwards,* 137 Wis. 2d 65, 87–88, 403 N.W.2d 438 (1987); *State v. King,* 82 Wis. 2d 124, 136, 262 N.W.2d 80 (1972); *State ex rel. Attorney Gen. v. Circuit*

ably burdens or substantially interferes with the contempt power of the judiciary, such interference with the courts' power to enforce their orders violates the separation of powers doctrine.[39]

¶ 136. "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice."[40] A court has an "inherent power to protect its own decrees and the private rights attendant on those decrees."[41] Intentional defiance of a court's judgment or order cannot be condoned. A party must be able to employ civil contempt proceedings to enforce its adjudicated rights. I therefore conclude that when a contempt has terminated and no remedial sanction is available under chapter 785, a court may exercise its inherent power to award compensatory damages to effectuate its order.[42]

---

*Court for Eau Claire County,* 97 Wis. 1, 8, 72 N.W. 193 (1887); Note, § 11, Laws of 1979, at 1355.

[39] *Kenosha County Dep't of Human Servs. v. Jodi W.,* 2006 WI 93, ¶ 20, 293 Wis. 2d 530, 716 N.W.2d 845; *State v. Holmes,* 106 Wis. 2d 31, 46, 315 N.W.2d 703 (1982).

[40] *Ex parte Robinson,* 86 U.S. 505, 510 (U.S. 1873).

[41] *Upper Lakes Shipping, Ltd. v. Seafarers' Int'l Union,* 22 Wis. 2d 7, 18, 125 N.W.2d 324 (1963).

[42] Furthermore, Wis. Stat. (Rule) § 805.03 provides, without regard to remedial contempt, that a court in which an action is pending may make such orders as are just for any party's failure to obey any order of the court. A circuit court may determine that the compensation requested by the Legal Aid Society may be a just order against the County, which intentionally failed to comply with a court order for nearly three years. *See* Wis. Stat. § 805.03 ("[F]or failure of any party to

¶ 137. For the reasons set forth, I write separately in dissent.

¶ 138. I am authorized to state that Justices ANN WALSH BRADLEY and N. PATRICK CROOKS join this opinion.

comply with the statutes governing procedure in civil actions or to obey any order of court, the court in which the action is pending may make such orders in regard to the failure as are just, including but not limited to orders authorized under s. 804.12(2)(a). . . .").